1  **SAN DIEGO UNIFIED PORT DISTRICT**
   **DUANE E. BENNETT, ESQ. (SBN 110202)**
2  **PORT ATTORNEY**
   **ELLEN BROSS MILES, ESQ. (SBN 149127)**
3  **DEPUTY PORT ATTORNEY**
   **3165 Pacific Highway**
4  **P.O. Box 120488**
   **San Diego, CA 92112-0488**
5  **Phone:      (619) 686-6219**
   **Fax:        (619) 686-6444**
6
   Attorneys for Defendant,
7  SAN DIEGO UNIFIED PORT DISTRICT

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 JOHN GALLAGHER,                    ) Case No. 08-CV-0886 IEG (RBB)
                                      )
12            Plaintiff,              ) **DEFENDANT SAN DIEGO UNIFIED PORT**
                                      ) **DISTRICT'S MEMORANDUM OF POINTS AND**
13 v.                                 ) **AUTHORITIES IN SUPPORT OF MOTION TO**
                                      ) **DISMISS PURSUANT TO F.R.C.P. 12(b)(6)**
14 SAN DIEGO UNIFIED PORT DISTRICT,   )
   CITY OF CORONADO, and DOES 1       )
15 through 20, inclusive,             ) Date:   September 15, 2008
                                      ) Time:   10:30 a.m.
16            Defendants.             ) Honorable Irma E. Gonzalez
                                      ) Courtroom 1
17                                    )
                                      )
18                                    )
                                      )
19 ─────────────────────────────────  )

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 1

The A-8 and A-9 Disabled Anchorages .......................................................................... 1

POINTS AND AUTHORITIES AND ARGUMENT................................................................ 6

I.   A COMPLAINT MAY BE DISMISSED FOR FAILURE TO STATE A CLAIM
     UPON WHICH RELIEF MAY BE GRANTED...................................................... 6

II.  ELIMINATING FREE AND LONG TERM ANCHORING IN THE A-8 ANCHORAGE
     DOES NOT VIOLATE THE ADA ........................................................................ 7

     A.   There is no Constitutional Right to Long-Term Unregulated Anchoring in
          San Diego Bay............................................................................................ 7

     B.   The ADA does not Require that the District Provide a Service or Program to
          the Disabled which it does not Provide for Anyone Else............................ 8

III. ELIMINATION OF FREE LONG TERM ANCHORING DOES NOT
     CONSTITUTE A VIOLATION OF EQUAL PROTECTION UNDER THE
     FOURTEENTH AMENDMENT ........................................................................... 9

IV.  THE DISTRICT DID NOT VIOLATE CALIFORNIA LAW REGARDING
     PROTECTIONS FOR DISABLED PERSONS..................................................... 10

V.   PLAINTIFF'S CLAIM FOR THE INTENTIONAL INFLICTION OF EMOTIONAL
     DISTRESS IS BARRED DUE TO HIS FAILURE TO COMPLY WITH THE
     CALIFORNIA GOVERNMENT CLAIMS ACT ..................................................... 12

CONCLUSION .................................................................................................................. 13

1

## TABLE OF AUTHORITES

2

**Cases**

3

*Balistreri v. Pacifica Police Department,* 901 F. 2d 696, 699 (9th Cir. 1990). ........................... 6

4

5

*Bohn v. Albertson*, 107 Cal. App. 2d 738, 756......................................................................... 7

6

*City of San Jose v. Superior Court*, (1974) 12 Cal. 3d 447, 455............................................. 12

7

8

*City of Stockton v. Superior Court (Civic Partners Stockton, LLC)*,
(2007) 42 Cal. 4th 730, 734.................................................................................................. 12

9

*Connelly v. County of Fresno*, (2006) 146 Cal. App. 4th 29, 37 ............................................ 12

10

*De La Cruz v. Torney*, 582 F.2d 45, 48 (9th Cir. 1978);............................................................ 6

11

*Frederiksen v. Poloway,* 637 f.2d 1147, 1150, n. 1 (7th Cir. 1978)........................................... 6

12

13

*Gallagher v. San Diego Unified Port District*, (1998) 62 Cal. App. 4th 501, 505.).................... 2

14

*Graf v. San Diego Unified Port District (Graf II)*, 7 Cal. App. 4th 1224, 1232-1233 (1992)... 7, 8

15

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989) ... 6

16

*In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 16, 19 (1st Cir. 2003)............................ 7

17

18

*Kaufman & Broad-South Bay v. Unisys Corp.,*  822 F. Supp. 1468, 1472 (N.D. Cal. 1993).... 6

19

*Laughlin v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir. 1957). ................................................ 6

20

*Marks v. Whitney*, 6 Cal. 3d 251, 259 (1971) ......................................................................... 7

21

*MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ................................... 6

22

*Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987). ......................................... 7

23

24

*Paulemon v. Tobin,* 30 F.3d 307, 308-309 (2nd Cir. 1994)....................................................... 6

25

*Rodriguez v. City of New York* , 197 F.3d 611, 619 (2nd Cir. 1999) ......................................... 8

26

*State of California v. Superior Court (Bodde)*, (2004) 32 Cal. 4th 1234, 1245........................ 12

27

*Thompson v. Illinois Dept. of Prof. Reg.,* 300 F.3d 750, 754 (7th Cir. 2002); ........................... 6

28

-ii-

*Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003) ........................................................ 8

*United States ex re. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 377 (5th Cir. 2004)... 6

**Statutes**

California Civil Code

   California Civil Code *§51* (Unruh Civil Rights Act) ................................................. 10

   California Civil Code *§52* ................................................................................... 10

   California Civil Code *§54* ................................................................................... 10

California Government Code

   Govt. Code §905 ............................................................................................ 12

   Govt. Code §910, et seq. (California Government Claims Act) ...................................... 1, 12

   Govt. Code §911.3 ......................................................................................... 12

   Govt. Code §945.4 ......................................................................................... 12

   Govt. Code *§4450* .....................................................................................1, 10, 11

California Health & Safety Code

   Cal. Health & Safety Code *§19955* .................................................................... 11

Federal Rules of Civil Procedure

   F.R.C.P. 12(b)(6) .......................................................................................... 1

Federal Rules of Evidence

   F.R.E. §201 ................................................................................................... 2

Health & Safety Code

   H&S Code §19955............................................................................................ 1

San Diego Unified Port District Codes

   UPD Code §4.36 (Ordinance 2107)........................................................1, 3, 4, 5, 9

UPD Code §4.38 ............................................................................................................. 3, 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Defendant, SAN DIEGO UNIFIED PORT DISTRICT (District), hereby submits the
2  following memorandum of points and authorities in support of its motion to dismiss the
3  complaint pursuant to F.R.C.P. 12(b)(6):

## INTRODUCTION

5    The complaint alleges five (5) causes of action against the District: 1) violation of the
6  Americans with Disabilities Act (ADA) [42 U.S.C. §12101]; 2) violation of equal protection
7  rights under the Fourteenth Amendment to the United States Constitution; 3) disability
8  discrimination under the ADA, Section 12132; 4) breach of statutory protections for physically
9  handicapped persons pursuant to *Cal. Civ. Code (Civ. Code)* §§51, 52, and 54; *Cal. Govt.
10 *Code (Govt. Code)* §4450, and *Cal. Health and Safety Code (H&S Code)* §19955; and 5)
11 intentional infliction of emotional distress.

12    Plaintiff has failed to state a claim upon which relief may be granted, pursuant to
13 F.R.C.P. 12(b)(6) for the following reasons: 1) the District's elimination of the A-8 Anchorage
14 as a free, long-term anchorage does not discriminate against plaintiff due to his disability
15 under Title II of the ADA nor does it constitute a violation of equal protection as a matter of
16 law; 2) plaintiff cannot state a claim for disability discrimination under *Civil Code* §§51, 52
17 and 54, *Govt. Code* §4450 and *H&S Code* §19955 because the District as a matter of law
18 has provided reasonable accommodations to plaintiff based upon facts which can be
19 judicially noticed by the Court; and 3) plaintiff is precluded from claiming an intentional
20 infliction of emotional distress because he failed to comply with the California Government
21 Claims Act (*Cal. Govt. Code* §910, et seq.) Therefore, the District's motion should be granted
22 in its entirety, without leave to amend.

## STATEMENT OF FACTS

24    The A-8 and A-9 Disabled Anchorages: The A-8 Anchorage is a federally-designated
25 anchorage located in Center San Diego Bay, just south of the Coronado Bay Bridge which
26 the District, under the authority designated it by the federal government, designated as a free
27 long-term anchorage. In August, 2000, the District passed Ordinance 2107, codified as UPD
28 Code §4.36. A copy of the agenda sheet is attached hereto as Exhibit "1" and incorporated

-1-

1   by this reference.[1]  A copy of  the ordinance originally approved by the Board of Port
2   Commissioners (BPC) is attached hereto as Exhibit "2" and incorporated by this reference.
3   The initial regulations were implemented due to the growing number of derelict and
4   abandoned vessels in the A-8 Anchorage, as well as the vessel owners in the A-8 Anchorage
5   contributing to environmental pollution by failing to use pump out stations and use of the
6   anchorage by overly large vessels (those in excess of 65'), commercial vessels, and barges.

7         In or about 1998, plaintiff filed two lawsuits, one in state court, and one in federal court.
8   His state court action resulted in a California appellate decision finding that the A-8
9   Anchorage constituted a public accommodation under Title II of the Americans with
10  Disabilities Act (ADA), (see, *Gallagher v. San Diego Unified Port District*, (1998)  62 Cal. App.
11  4th 501, 505.) His federal lawsuit, entitled *John Gallagher v. San Diego Unified Port District*,
12  United States District Court Case No. 98 CV 0615 J (JAH), alleged disability discrimination in
13  violation of Title II of the ADA.  There were two components of plaintiff's federal lawsuit: 1)
14  that the District denied the disabled access to San Diego Bay in terms of its boat docks and
15  ramps; and 2) that the District's anchoring regulations discriminated against persons with
16  disabilities from anchoring in San Diego Bay (the "anchoring claim".)

17        On August 8, 2000, a settlement agreement and release of claims (settlement
18  agreement) was filed with the District Clerk as Document 40940 regarding plaintiff's
19  accessibility claims.  The anchoring claim was specifically excluded from the terms of the
20  settlement agreement.  A copy of the settlement agreement is attached hereto as Exhibit "3"
21  and incorporated by this reference.  Attached to the settlement agreement (Exhibit "3") are
22  Exhibits "A" and "B" which contain an extensive list of ADA improvements which the District
23  was to make as part of the settlement agreement.

24        On November 17, 2000, the District made a third offer of judgment to plaintiff in Case
25  No. 06 CV 0615 J (JAH) wherein the District agreed to issue a permit to plaintiff to anchor in

27  [1] The District is requesting that the Court take judicial notice of this official record of the
28  District as well as several others, pursuant to F.R.E. §201.  Please see the District's Request
for Judicial Notice filed and served herewith.

-2-

1   a portion of the A-9 ("cruiser's")[2] Anchorage free and long-term, subject to all the regulations
2   applicable to the A-8 Anchorage.  A copy of the third offer of judgment is attached hereto as
3   Exhibit "4" and incorporated by this reference.  Plaintiff accepted the third offer of judgment
4   on November 27, 2000. A copy of the acceptance is attached hereto as Exhibit "5" and
5   incorporated by this reference.

6       In 2003, the A-9 Disabled Anchorage and the permit requirements set forth in Exhibit
7   "4" were codified in UPD Code §4.38 (see specifically §4.38(h)4.d.) by BPC passage on June
8   3, 2003.  A copy of UPD Code §4.38 is attached hereto as Exhibit "6" and incorporated by
9   this reference, and the Court is requested to take judicial notice of same.

10      On May 15, 2003, the District submitted a completion report to the United States Army
11  Corps of Engineers for accessible boat docks in San Diego Bay.  A copy of the report is
12  attached hereto as Exhibit "7" and incorporated by reference, and the Court is requested to
13  take judicial notice of same.

14      At the end of 2005, due to a substantial increase in costs due to abandoned and
15  derelict vessels in the A-8 Anchorage, as well as an increase in crime and environmental and
16  pollution concerns again caused by boats being sunk or sinking and causing navigational and
17  environmental hazards, District staff presented agenda items to the BPC to elicit discussion
18  concerning the issues involving the A-8 Anchorage.  All these meetings were open to the
19  public and were noticed in compliance with the Ralph M. Brown Act.  A copy of the BPC
20  meeting agenda on December 6, 2005 to discuss the A-8 Anchorage is attached hereto as
21  Exhibit "8" and incorporated by this reference.  Further, the minutes of that meeting
22  concerning the agenda item are attached hereto as Exhibit "9" and incorporated by this
23  reference.

24      Based upon direction received from the BPC, several additional public meetings were
25  held with the BPC during 2006. On May 2, 2006, staff recommended potential changes to
26  UPD Code §4.36 to remediate environmental and pollution concerns as well as address the

27
28  [2] The A-9 Cruiser's Anchorage is designated for short-term anchoring (three thirty (30) day
    permits) for a total stay of ninety (90) days maximum solely for use by out-of-county vessel
    owners (also known as "cruisers").

-3-

1 burgeoning number of abandoned and derelict vessels left in the A-8 Anchorage or vessels
2 impounded and never retrieved by their owners. A copy of the agenda sheet for the May 2,
3 2006 BPC meeting is attached hereto as Exhibit "10" and incorporated by this reference. The
4 minutes of the meeting reflecting the BPC members' comments are attached hereto as
5 Exhibit "11" and incorporated by this reference. This agenda sheet is notable for the amount
6 of debris located under the A-8 Anchorage (248 items) in an 80 acre parcel compared to 19
7 items of debris found in the A-2 (America's Cup Harbor) Anchorage (15 acres) and 14 items
8 of debris found in the A-3 (Laurel Street) Anchorage (47 acres).

9        Further, crime data collected by the Harbor Police Department reflected that
10 approximately 50% of all anchorage and mooring related crime reports, arrest, and citations
11 were issued in the A-8 Anchorage as of that time. Further, 73% of all vessels towed and
12 stored from an anchorage or mooring were from the A-8 Anchorage (Exhibit "8").

13        On June 6, 2006, the BPC met again in public session and approved staff's
14 recommendation to implement its proposal to install additional mooring buoys in established
15 mooring fields and to return to the BPC with an update on the proposed amendments to UPD
16 Code §4.36. The BPC further approved at that time to eliminate free long-term anchoring in
17 the A-8. A copy of the BPC agenda sheet for June 6, 2006 is attached hereto as Exhibit "12"
18 and incorporated by this reference, and the minutes of said meeting are attached hereto as
19 Exhibit "13" and incorporated by this reference.

20        On July 26, 2006, two days after he received his ADA permit, plaintiff claims his vessel
21 was vandalized and he explained to the District that he would be unable to use his sailboat
22 until January, 2007 (complaint, ¶10).

23        On September 5, 2006, District staff returned to the BPC and conducted a public
24 hearing where the BPC adopted amendments to UPD Code §4.36. The amendments
25 included strengthening the regulations pertaining to seaworthiness of vessels, imposing a dye
26 tab requirement, requiring the use of pump-out facilities and a log for documentation,
27 requiring a refundable deposit of $2500 for each permittee which would be used for cost
28 recovery should the vessel become abandoned or sunken requiring the District to expend

-4-

1   substantial funds for impound, storage, lien sale, demolition and disposal, allowing only one
2   (1) vessel per permittee, but giving the permittee a six (6) month period to remove any
3   additional vessels from the A-8 Anchorage, and expanding the grounds upon which the
4   District could revoke or refuse to issue an A-8 Anchoring permit, as well as a requirement that
5   all construction materials, refuse, spare parts, and additional equipment be stored in an
6   enclosed space to minimize the risk of such items going overboard and littering and polluting
7   the bottom of the bay.  The District also amended Section 4.36 to discontinue issuing new
8   permits to anchor in the A-8 and A-9 Disabled Anchorages and stated that existing permits
9   would only be re-issued to "Vessels with current valid Permits and meeting all the
10  requirements and conditions of this Section." (Emphasis added.)  UPD Code §4.36(c) 11.  A
11  copy of the September 5, 2006 BPC agenda sheet is attached hereto as Exhibit "14" and
12  incorporated by this reference, and a copy of the minutes of said meeting are attached hereto
13  as Exhibit "15" and incorporated by this reference.  These requirements also applied to the A-
14  9 Disabled Anchorage permittees, such as plaintiff, because they were required to comply
15  with all regulations applicable to the A-8 Anchorage (Exhibit "4", 2:12-13).

16          In January, 2007, as plaintiff's vessel was still being repaired, he made several phone
17  calls and letters to the District regarding renewing his A-9 Disabled Anchorage permit but was
18  ignored (complaint, ¶10).

19          On July 6, 2007, after meeting with plaintiff on July 3, 2007, District counsel Ellen
20  Miles wrote a letter to plaintiff stating that his permit had expired pursuant to UPD Code §4.36
21  as a result of the BPC's amendments made on September 5, 2006 (complaint, ¶11, Exhibit
22  "14; Exhibit "15").  A copy of the letter sent to plaintiff from defense counsel Miles is attached
23  hereto as Exhibit "16" and incorporated by this reference.

24          As a matter of law, the facts plead by plaintiff fail to state a claim upon which relief can
25  be granted.  Amending UPD code §4.36 to require that permits to anchor would only be re-
26  issued to vessels with current valid permits does not violate the ADA, the Fourteenth
27  Amendment or California law.  Further, the BPC's decision to eliminate free long term
28  ///

-5-

08 CV 0886 IEG (RBB)

1   anchoring in the A-8 Anchorage, which would also eliminate it in the A-9 Disabled Anchorage,

2   is not a violation of plaintiff's rights under the ADA or state law.

## POINTS AND AUTHORITIES

## AND ARGUMENT

### I.

### A COMPLAINT MAY BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

8   Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal of a

9   complaint for "failure to state a claim upon which relief may be granted." A motion to dismiss

10  is the proper method for testing the legal sufficiency of the complaint. *De La Cruz v. Torney*,

11  582 F.2d 45, 48 (9th Cir. 1978); *Laughlin v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir. 1957).

12  Although the material allegations of a plaintiff's complaint are taken as true for the

13  purpose of a motion to dismiss, unsupported conclusions of law and sweeping deductions of

14  fact are not to be taken as true. *Frederiksen v. Poloway,* 637 f.2d 1147, 1150, n. 1 (7th Cir.

15  1978); *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093, 1096 (9th Cir. 1976).

16  Dismissal may be based 1) on the lack of a cognizable legal theory, or 2) the absence of

17  sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police*

18  *Department,* 901 F. 2d 696, 699 (9th Cir. 1990).

19  Documents attached to a complaint may be considered and treated as part of the

20  complaint for purposes of a Rule 12(b)(6) motion to dismiss. *Hal Roach Studios, Inc. v.*

21  *Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1989); *Paulemon v. Tobin,* 30 F.3d

22  307, 308-309 (2nd Cir. 1994); *Kaufman & Broad-South Bay v. Unisys Corp.,* 822 F. Supp.

23  1468, 1472 (N.D. Cal. 1993). Further, "[w]hen a written instrument contradicts allegations in

24  a complaint to which it is attached, the exhibit trumps the allegations." *Thompson v. Illinois*

25  *Dept. of Prof. Reg.,* 300 F.3d 750, 754 (7th Cir. 2002); *United States ex re. Riley v. St. Luke's*

26  *Episcopal Hosp.,* 355 F.3d 370, 377 (5th Cir. 2004).

27  Finally, a matter that is properly the subject of judicial notice may be considered along

28  with the complaint when deciding a motion to dismiss for failure to state a claim. *MGIC*

-6-

1   *Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *In re Colonial Mortgage*

2   *Bankers Corp.*, 324 F.3d 12, 16, 19 (1st Cir. 2003). Additionally, the court need not accept as

3   true allegations in the complaint that contradict facts that may be judicially noticed by the

4   court. *Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987).

5                                             **II.**

6                 **ELIMINATING FREE AND LONG TERM ANCHORING IN THE**

7                 **A-8 ANCHORAGE DOES NOT VIOLATE THE ADA**

8     **A. There is no Constitutional Right to Long-term Unregulated Anchoring in San**

9   **Diego Bay:**

10       The complaint alleges that the District violated the ADA as a result of the BPC's vote

11   on June 6, 2006, to eliminate the A-8 Anchorage as a free, long-term anchorage in San

12   Diego Bay, because of plaintiff's unsupported belief that he has a right to free, long-term

13   anchorage. First of all, it is axiomatic that boaters do **not** have a constitutional right to

14   unregulated long-term anchorage in public navigable waters. *Graf v. San Diego Unified Port*

15   *District (Graf II)*, 7 Cal. App. 4th 1224, 1232-1233 (1992). In fact, in *Graf II*, the court, referring

16   to the California Supreme Court's decision in *Marks v. Whitney*, 6 Cal. 3d 251, 259 (1971)

17   noted that the *Marks* court drew its reference to the public's right to anchor as "'the incidental

18   use of the bottom.'" This reference in turn came from *Bohn v. Albertson*, 107 Cal. App. 2d

19   738, 756, approved of by the *Marks* court, which explained: ""The interest of the public in the

20   …bed of a navigable river is analogous to that of the public in a public road. It has the right of

21   passage over the stream as it had over the road.""" Similarly, plaintiff has identified no federal

22   constitutional right that allows him as a matter of right to free, long-term unregulated

23   anchoring in San Diego Bay.

24       Additionally, the elimination of the A-8 Anchorage does not prohibit or preclude plaintiff

25   from navigating or anchoring in other areas of San Diego Bay. UPD Code §4.38 provides

26   free anchoring for limited periods of time in the A-1 (La Playa) Anchorage located near

27   Shelter Island, as well as the A-5 (Glorietta Bay) Anchorage located near Coronado.

28   Moreover, as pointed out by the Court in *Graf II*, "[b]oaters, of course, may dock boats at

-7-

1  private marinas in the bay provided they pay the charges imposed by the marinas." *Graff II*,

2  *supra*, 7 Cal. App. 4th at 1233, n. 11. Further, there are also mooring buoys provided for

3  monthly rent in several areas of San Diego Bay, such as the foot of Laurel Street (the A-3

4  Anchorage), near the Coronado Bay Bridge and golf course (the A-4 Anchorage), and

5  alongside the western edge of Shelter Island (the A-1d Anchorage).

6  **B.  The ADA does not Require that the District Provide a Service or Program to**

7  **the Disabled which it does not Provide for Anyone Else:**

8  Finally, "it is clear from the language of Title II...that public entities are not required to

9  create new programs that provide heretofore un-provided services to assist disabled

10  persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003). In *Townsend*, disabled

11  persons challenged the State of Washington's decision to use community-based services to

12  provide essential long-term care to some disabled Medicaid recipients but not others.[3] In

13  deciding that the state's practice may violate Title II, the Ninth Circuit made a critical

14  distinction by defining the issue as "*where* [an agency] should provide treatment, not *whether*

15  it must provide it." *Id.*, at 517, citing *Rodriguez v. City of New York* , 197 F.3d 611, 619 (2nd

16  Cir. 1999) (emphasis added.)

17  In *Rodriguez*, a class of mentally disabled persons sued the City of New York for not

18  including safety-monitoring devices along with other personal care services to assist in their

19  daily living tasks. The Second Circuit determined that the City provided the same services to

20  both physically and mentally disabled individuals, and that the class was solely arguing that

21  the City *should* provide safety-monitoring services. Title II, the Second Circuit determined,

22  required that only "the services [*the state] in fact provide[s]*" must be administered non-

23  discriminatorily. *Id.*, at 618 (citation omitted.)

24  In this case, the "service" being provided by the District is being terminated due to

25  issues of cost, derelict and abandoned vessels, environmental and sanitation concerns, and

26  increased crime. In essence, plaintiff is demanding that the District provide an

27

28  [3] Plaintiff Townsend was not "financially needy" as determined by his income, only "medically needy." Only financially needy disabled persons were eligible for the program.

-8-

1  provide such an accommodation, and in fact, doing such would actually provide disabled

2  boaters such as plaintiff with preferential treatment in that they would receive a benefit no

3  other boater would in the entirety of San Diego Bay.  Because plaintiff cannot show the either

4  the A-8 Anchorage or the A-9 Disabled Anchorage were eliminated by the BPC in order to

5  discriminate against the disabled, any of plaintiff's claims challenging the BPC's decision on

6  that basis must be rejected as a matter of law.

7  In fact, this Court has previously ruled in the District's favor on this exact issue.  On

8  April 4, 2007, in *Renard v. San Diego Unified Port District, et al.*, United States District Court

9  Case No. 06-CV-2665H(BLM), Judge Huff, in dismissing plaintiff Renard's first amended

10  complaint for disability discrimination held as follows:

11  > Here, the Board voted to eliminate free long term anchoring in the
12  > A-8.  Thus, the Port District is eliminating the service for which it
   > originally created the reasonable accommodation.  Because the
   > Port District will not be providing free long term anchoring to
13  > boaters in A-8, it need not reasonably accommodate disabled
   > boaters by providing them with free long term anchoring in the A-9
14  > (citation omitted.)

15  A copy of the Court's order granting defendants' motion to dismiss without prejudice is

16  attached hereto as Exhibit "17" and incorporated by this reference.

17  **III.**

18  **ELIMINATION OF FREE LONG TERM ANCHORING DOES NOT
   CONSTITUTE A VIOLATION OF EQUAL PROTECTION UNDER
19  THE FOURTEENTH AMENDMENT**

20  Plaintiff claims that the District's elimination of free and long term anchoring in the A-8

21  and A-9 Disabled Anchorages violated his right to equal protection of the laws pursuant to the

22  Fourteenth Amendment to the United States Constitution because it was done to discriminate

23  against disabled boaters.  However, the judicially noticeable evidence produced by the

24  District shows unequivocally that free long term anchoring was eliminated for all vessel

25  owners in San Diego Bay due to an increase in crime, abandoned and derelict vessels, and

26  environmental concerns.  Further, to the extent that plaintiff argues he was denied due

27  process, he was given an opportunity to appeal the revocation of his anchoring permit

28  through an appeal process set out in UPD Code §4.36 of which he did not take advantage

-9-

1   through an appeal process set out in UPD Code §4.36 of which he did not take advantage
2   (see Exhibit "16".)  The BPC's elimination of the free, long-term A-8 Anchorage and inclusion
3   of the A-9 Disabled Anchorage shows that the District and the BPC are treating all boaters
4   the same. All boaters will still be able to anchor in various parts of San Diego, but no boater
5   will be able to anchor for free and long-term.

**IV.**

### THE DISTRICT DID NOT VIOLATE CALIFORNIA LAW REGARDING PROTECTIONS FOR DISABLED PERSONS

9   Plaintiff's fourth cause of action sets forth several California statutes he claims the
10  District violated as a result of his claim that the District engaged in disability discrimination
11  prohibited by the ADA when it eliminated free long term anchoring in San Diego Bay. He also
12  alleges in the statement of facts that "[d]efendant's [sic] SAN DIEGO UNIFIED PORT
13  DISTRICT, CITY OF CORONADO has continued to do absolutely nothing about ADA
14  accommodations, or access on the issue of boat ramps and dock ramps within ADA
15  anchorage 9, Anchorage 3, Anchorage 5, and the City of Coronado (complaint, ¶12.)
16  Further, plaintiff alleges that "[d]efendant, SAN DIEGO UNIFIED PORT DISTRICT continues
17  to violate the American Disability Act [sic] and State regulations promulgated pursuant to the
18  State statutes by constructing, or altering San Diego Bay docks without installing ramps at
19  the docks" (complaint, ¶28.)

20  *Cal. Civ. Code §*51 is the Unruh Civil Rights Act, which requires that all persons,
21  regardless or sex, race, color, religion as well as disability or medical condition be entitled to
22  the full and equal accommodations in all business establishments. Section 52 provides a
23  private right of action for damages and other relief. Section 54 provides that "[i]nidividuals
24  with disabilities or medical conditions have the same right as the general public to the full and
25  free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities,
26  including hospitals, clinics and physicians' offices, public facilities, and other public places."

27  *Cal. Govt. Code §*4450 requires that all "buildings, structures, sidewalks, curbs, and
28  related facilities, constructed in this state by the use of state, county, or municipal funds, or

-10-

1  the funds of any political subdivision of the state shall be accessible to and useable by

2  persons with disabilities." Finally, *Cal. Health & Safety Code* §19955 states that "[t]he

3  purpose of this part is to insure that public accommodations or facilities constructed in this

4  state with private funds adhere to the provisions of [*Cal. Govt. Code* §4450]" (cited above.)

5  Plaintiff's allegations regarding the District's failure to comply with the ADA and

6  California law are vague and conclusory. The allegations are also puzzling in light of the fact

7  that plaintiff entered into a settlement agreement with the District which set forth numerous

8  ADA projects to be done as a part of the settlement (see Exhibit "3") but does not seek to

9  enforce the settlement agreement. Further, plaintiff's allegations concerning the A-3

10  Anchorage and A-9 Anchorage are patently false based upon the judicially noticeable

11  completion report prepared by the District for the US Army Corps of Engineers showing the

12  accessible dock at the A-3 Anchorage site (Exhibit "7"). The dock at the A-3 Anchorage is

13  also used by the A-9 Anchorage as the anchorage is right next to it and there is no other

14  access to the A-9 except by using the A-3 Anchorage dock. It is further puzzling that plaintiff

15  is alleging deficiencies in the A-5 ("Glorietta Bay") Anchorage, as plaintiff, in 2003, moved the

16  court to enforce the third offer of judgment regarding his anchoring claim (see Exhibit "4") by

17  requesting that the court order the District to allow him to anchor free and long term in

18  Glorietta Bay (a copy of plaintiff's motion to enforce the judgment is attached hereto as

19  Exhibit "18" and the court is requested to take judicial notice of same.) He clearly was able to

20  use Glorietta Bay in 2003, and the complaint is silent with respect to any changes the

21  anchorage may have undergone in the last five (5) years which could have made the

22  anchorage less accessible. Given the judicially noticeable evidence which clearly refutes

23  plaintiff's allegations, it is obvious that plaintiff has failed to state a claim upon which relief

24  may be granted regarding the allegations of inadequate dock/ramp facilities.

25  / / /

26  / / /

27  / / /

28  / / /

-11-

1

**V.**

2

3

4

### PLAINTIFF'S CLAIM FOR THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IS BARRED DUE TO HIS FAILURE TO COMPLY WITH THE CALIFORNIA GOVERNMENT CLAIMS ACT

5   Under the Government Claims Act (*Govt. Code* §910, *et seq.*, a plaintiff may not

6   maintain an action for money or damages against a public entity unless first a written claim

7   has been presented to the public entity and rejected in whole or part. *Govt. Code* §§905,

8   905.2, 945.4. Failure to timely present a claim for money or damages to a public entity bars a

9   plaintiff from filing a lawsuit against that entity. *Govt. Code §945.4; Connelly v. County of*

10   *Fresno*, (2006) 146 Cal. App. 4th 29, 37, citing *State of California v. Superior Court (Bodde)*,

11   (2004) 32 Cal. 4th 1234, 1245. Before a cause of action may be stated, a plaintiff must allege

12   either compliance with this procedure or circumstances excusing compliance. *Id.* A claim

13   relating to a personal injury cause of action must be presented within six (6) months after

14   accrual of the cause of action. *Govt. Code* §911.3        Recently, upholding earlier appellate

15   court precedent, the California Supreme Court squarely held that the provisions of the

16   Government Claims Act apply to breach of contract claims. *City of Stockton v. Superior*

17   *Court (Civic Partners Stockton, LLC)*, (2007) 42 Cal. 4th 730, 734. The purpose of the claims

18   statutes is not to prevent surprise, but "to provide the public entity sufficient information to

19   enable it to adequately investigate claims and to settle them, if appropriate, without the

20   expense of litigation. *Id.*, at p. 738, citations omitted. "It is well settled that claims statutes

21   must be satisfied even in the face of the public entity's actual knowledge of the circumstances

22   surrounding the claim." *Id.*, citing *City of San Jose v. Superior Court*, (1974) 12 Cal. 3d 447,

23   455.

24   In this case, the complaint contains no allegations indicating compliance with the

25   California Government Claims Act, and therefore, plaintiff's fifth cause of action for the

26   intentional infliction of emotional distress must be dismissed. As the six month time period

27   has elapsed from the date of plaintiff's injury, plaintiff cannot cure the defect, and this claim

28   must be dismissed without leave to amend.

-12-

1

## **CONCLUSION**

2       As a matter of law, the complaint fails to state a claim upon which relief may be

3   granted. The District's decision to eliminate free, long term anchoring in the A-8 and A-9

4   Disabled Anchorages does not violate plaintiff's rights under the ADA, the Fourteenth

5   Amendment, or California law. The District's revocation of plaintiff's anchoring permit

6   likewise does not constitute discrimination in that the revocation was based upon plaintiff's

7   failure to renew it in a timely manner, not because he was disabled. Finally, plaintiff's claims

8   that the District has inaccessible docks is clearly refuted by judicially noticeable evidence

9   showing that the A-3 and A-9 Anchorages dock is accessible, and that plaintiff has not been

10   precluded from using Glorietta Bay based upon his own request to the court five years ago to

11   allow him to anchor there free and long term as an alternative to the A-9 Anchorage.

12   Therefore, the complaint should be dismissed without leave to amend.

13

14                                Respectfully submitted,

15

16   Dated: August 5, 2008                SAN DIEGO UNIFIED PORT DISTRICT
                                          DUANE E. BENNETT
17                                        PORT ATTORNEY

18
                                    By:    s/ Ellen Gross Miles
19                                         ELLEN GROSS MILES
                                           Deputy Port Attorney
20                                         Attorney for Defendants
                                           egmiles@portofsandiego.org
21

22

23

24

25

26

27

28

-13-

**Gallagher v. San Diego Unified Port District, et al.**
**Case No. 08-CV-0886 IEG (RBB)**

## INDEX TO EXHIBITS

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 1 | 1-8 | Agenda Sheet of the Board of Port Commissioner's meeting regarding §4.36, dated August 22, 2000 |
| 2 | 9-21 | Original Ordinance 2107 (§4.36), dated August 22, 2000 |
| 3 | 22-36 | Settlement Agreement and Release of Claims dated August 8, 2000 in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |
| 4 | 37-41 | Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/17/00 |
| 5 | 42-43 | Plaintiff's Acceptance of Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/27/00 |
| 6 | 44-57 | UPD Code §4.38, dated June 3, 2003 |
| 7 | 58-65 | Completion Report submitted by District to the United States Army Corps of Engineers, dated May 15, 2003 |
| 8 | 66-67 | Agenda Sheet of the Board of Port Commissioner's December 6, 2005 meeting regarding the A-8 Anchorage |
| 9 | 68-71 | Minutes from the December 6, 2005 Board of Commissioner's meeting |
| -- | 72-75 | *BLANK* |
| 10 | 76-84 | Agenda Sheet of the Board of Port Commissioner's May 2, 2006 meeting regarding the A-8 Anchorage |
| 11 | 85-91 | Minutes from the May 2, 2006 Board of Commissioner's meeting |
| 12 | 92-101 | Agenda Sheet of the Board of Port Commissioner's June 6, 2006 meeting regarding the A-8 Anchorage |
| 13 | 102-105 | Minutes from June 6, 2006 Board of Port Commissioner's meeting |
| 14 | 106-116 | Agenda Sheet of the Board of Port Commissioner's September 5, 2006 meeting regarding the A-8 Anchorage |
| 15 | 117-120 | Minutes from September 5, 2006 Board of Port Commissioner's meeting |
| 16 | 121-140 | Letter to John Gallagher from Ellen Gross Miles, dated July 6, 2007 |

**Gallagher v. San Diego Unified Port District, et al.**
**Case No. 08-CV-0886 IEG (RBB)**

## INDEX TO EXHIBITS (p. 2)

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 17 | 141-159 | Order Granting Defendants' Motion to Dismiss Without Prejudice, dated 4/4/07, in *Renard v. San Diego Unified Port District*, 06-CV-2665 H (BLM) |
| 18 | 160-196 | Plaintiff's Notice of Motion and Motion to Enforce Judgment, with accompanying documents, dated November 1, 2002, in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |

**EXHIBIT 1**

000001



## San Diego Unified Port District
## AGENDA SHEET

**DATE:**    **August 10, 2000**                                    **Page 1 of 4**

**SUBJECT:   PUBLIC HEARING AND ADOPT ORDINANCE AMENDING ARTICLE 4 OF
THE SAN DIEGO UNIFIED PORT DISTRICT CODE TO ESTABLISH RULES
AND REGULATIONS GOVERNING THE USE OF THE CENTRAL SAN DIEGO
BAY ANCHORAGE A-8**

### EXECUTIVE SUMMARY:

This ordinance establishes rules and regulations for the use of the A-8 Anchorage.
The A-8 Anchorage was created in 1987 as an open, unregulated anchorage
allowing watercraft unrestricted use.   This ordinance prohibits commercial use,
establishes a permit process and requires an inspection for seaworthiness and
environmental compliance before vessels anchor in the A-8 Anchorage.

### EXECUTIVE DIRECTOR'S RECOMMENDATION:

1. Conduct public hearing.

2. Adopt this ordinance amending Article 4 of the San Diego Unified Port District
Code establishing rules and regulations governing the use of the Central San Diego
Bay Anchorage A-8.

### FACTUAL BACKGROUND:

The 82 acre A-8 Anchorage was created on February 10, 1987 (Enacted February
10, 1987 – Ordinance 1201; Amended June 18, 1991 – Ordinance 1436) as an
open, unregulated anchorage in Central San Diego Bay.  Immediately south of the
A-8 Anchorage is the environmentally sensitive waters of South San Diego Bay.
The tidelands of National City and Chula Vista are ¼ mile downwind of the
Anchorage.

The A-8 Anchorage has been used as a dumping ground for abandoned vessels,
dry docks and barges that the District removed and destroyed at substantial cost.

---

**ACTION TAKEN:**   8/22/00 - Public Hearing - Ord. 2107

---

UPD FORM NO. 021 C (7/98)



**Agenda Sheet**
**Page 2 of 4**

**Subject:    ORDINANCE AMENDING ARTICLE 4 OF THE SAN DIEGO UNIFIED PORT
DISTRICT CODE TO ESTABLISH RULES AND REGULATIONS GOVERNING
THE USE OF THE CENTRAL BAY ANCHORAGE A-8**

Vessels without proper ground tackle drag across the A-8 Anchorage, collide with
other vessels and go aground on National City and Chula Vista tidelands. When
owners leave their vessels unclaimed, the District removes and destroys the
abandoned vessels at substantial cost.

Many vessels in the A-8 Anchorage are incapable of moving under their own
propulsion.

In August 1999, the Coast Guard Auxiliary conducted a survey of pump-a-head
usage in the Bay. That survey noted that the pump-a-head in National City was
the least used in the Bay.

Currently, the A-8 Anchorage has 40 live aboard vessels, 60 unoccupied vessels
and 20 commercial vessels. Of all these vessels, only seven are anchored legally
with anchor balls and lighting. Harbor Police officers have given notice of
violation to all identifiable boat owners.

The Harbor Police Department recently videotaped the A-8 Anchorage daily for 30
days to determine if vessels were getting underway to use pump out facilities.
This activity substantiated that few vessels were capable of moving under their
own power.

Before the A-8 Anchorage opened, District divers surveyed the bottom and a
contractor removed the debris. During the week of June 7, 2000, a video survey
of the A-8 Anchorage was conducted using an underwater camera to determine
what debris currently exists on the bottom. The survey was conducted on spaced
tract lines covering the A-8 Anchorage and adjacent waters. The survey identified
165 objects that included tires, pilings, barrels, mounds of unidentifiable debris,
buckets, and car parts. It is important to note that this does not reflect all of the
debris on the bottom of the A-8 Anchorage, only the areas transited by the
camera.

In 1999, the Harbor Police Department impounded 149 vessels from the A-8
Anchorage, 67 of which were abandoned and destroyed at a cost to the District



**Agenda Sheet**
**Page 3 of 4**

**Subject:** **ORDINANCE AMENDING ARTICLE 4 OF THE SAN DIEGO UNIFIED PORT DISTRICT CODE TO ESTABLISH RULES AND REGULATIONS GOVERNING THE USE OF THE CENTRAL BAY ANCHORAGE A-8**

of $138,000. Through July 2000, 16 abandoned vessels were impounded from the A-8 Anchorage and subsequently destroyed at a cost of $118,000.

**Environmental Review:**

The project is determined to be Categorically Exempt pursuant to CEQA Guidelines Section 15308, Class 8 and Resolution 97-191: Actions by Regulatory Agency for Protection of the Environment: Includes actions taken by regulatory agencies to assure the maintenance, restoration, enhancement, or protection of the environment where the regulatory process involves procedures for protection of the environment. Construction activities and relaxation of standards allowing environmental degradation are not included in this exemption (83356-X-489).

**Treasurer's Certificate:**

Not applicable.

**Fiscal Impact Statement:**

No fiscal impact.

**ANALYSIS:**

By this ordinance, vessel owners must obtain an Anchoring Permit from the Harbor Police Department prior to anchoring in the A-8 Anchorage. The permit requirements include proof of ownership, current registration, and a vessel inspection for seaworthiness and environmental compliance.

At this time, there is no fee proposed for obtaining an Anchoring Permit.

This ordinance prohibits commercial enterprise in the A-8 Anchorage. Barges, floating docks, and vessels of more than 65 feet are also prohibited. Barges engaged in legitimate maritime commerce activities may be issued a permit to anchor outside the A-8 Anchorage on a case by case basis.

**Agenda Sheet**
**Page 4 of 4**



**Subject:**   **ORDINANCE AMENDING ARTICLE 4 OF THE SAN DIEGO UNIFIED PORT DISTRICT CODE TO ESTABLISH RULES AND REGULATIONS GOVERNING THE USE OF THE CENTRAL BAY ANCHORAGE A-8**

It is expected that the permit process established in this ordinance will reduce potential environmental hazards and the cost of removing derelict vessels from the A-8 Anchorage.

An educational period will precede enforcement.

**Equal Opportunity Program:**

Not applicable.

**Prepared by:**
James P. Krusen, Harbor Police Captain

**19**
**AB**

Attachment to Agenda Sheet No.

## PROPOSED RULES AND REGULATIONS
## FOR THE A8 ANCHORAGE

I. Permits

    **A. An Anchoring Permit must be obtained from the Harbor Police prior to anchoring in the A8 Anchorage.**

    **B.** Prior to receiving an Anchoring Permit, **the following requirements must be satisfied:**

        1. Proof of ownership

        2. Verification of registration

        3. Inspection for seaworthiness and environmental compliance

        4. Vessel must be brought under its own power to the designated inspection **site at the Laurel Street Roadstead dinghy dock. Inspections are conducted Saturdays between 8:00 a.m. and 4:00 p.m.**

        5. **Anchoring Permits are available from the Harbor Police at the Shelter Island Harbor Police Facility. Permits may be obtained seven days a week, between 8:00 a.m. and 5:00 p.m.**

    C. Permits must be renewed every six months.

    D. There is no fee for obtaining an Anchoring Permit.

II. Uses Prohibited

    A. No business or commercial enterprise shall be conducted at the A8 Anchorage.

    B. No barges and floating docks shall be allowed to moor or anchor at the A8 Anchorage.

    C. No vessel more than Sixty-five (65) feet in length shall be allowed to moor at the A8 Anchorage.

    D. **With the exception of emergencies,** major repairs or servicing of a vessel in the A8 Anchorage is prohibited except upon the prior written authorization of the District. **Major repairs are defined as welding or spray painting on the exterior of a vessel, exterior sandblasting, and any work beyond repair or replacement of electrical equipment, mechanical or hydraulic components, or repair and adjustment to machinery which remains onboard the vessel.**

000000



Attachment to Agenda Sheet No.

III.  **Abandoned Vessels**

    A.  **No vessel shall be left in the A8 Anchorage with the intent to abandon such vessel.  A vessel shall be considered abandoned if that vessel is left unattended by the vessel owner or designated caretaker for a period longer than thirty days.**

    B.  **Upon proper notice as required by law, the District has the right to tow and store or demolish an abandoned vessel at the expense of the vessel owner and recover such expense from the owner.**

IV.  Administration

    A.  Harbor Police personnel will administer the inspection program and issue Anchoring Permits for A8.

V.  Regulations

    A.  **Harbor Police will enforce applicable District, State, and Federal regulations within the A8 Anchorage.**

VI.  Commercial Activity

    A.  **The A8 Anchorage regulations prohibit commercial activity in the A8 Anchorage. Barges engaged in legitimate maritime commerce activities may be issued anchoring permits outside the A8 Anchorage on a case-by-case basis.**

VII.  Applicant's or Permittee's Right of Appeal

    A.  **If the District refuses to issue an Anchoring Permit to an applicant, that applicant may appeal the refusal, in writing, to the Executive Director within Ten (10) calendar days of the date of refusal.**

    B.  **If the District revokes a Permittee's Anchoring Permit, that permittee may appeal such revocation, in writing, to the Executive Director within Ten (10) days of the date of revocation.**

**San Diego Unified Port District**

**September 6, 2000**

To:      **Board of Port Commissioners**

Via:     **Dennis P. Bouey,**
         **Executive Director**

From:    **Dave Hall,**
         **Chief of Harbor Police**

Subject: **Agenda Sheet Correction**

The number of vessels stored from the A-8 Anchorage in 1999 was incorrectly identified on the August 22 Agenda Sheet as 149. The number of vessels stored from the A-8 Anchorage in 1999 was 30. In 1999, 149 vessels were stored from the entire bay. We are researching whether the dollar amount ($138,000) was attributable to the A-8 Anchorage or based on impounds from the entire bay.

Rita Vandergaw is informing the media.