## Gallagher v. San Diego Unified Port District, et al.
**Case No. 08-CV-0886 IEG (RBB)**

### INDEX TO EXHIBITS

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 1 | 1-8 | Agenda Sheet of the Board of Port Commissioner's meeting regarding §4.36, dated August 22, 2000 |
| 2 | 9-21 | Original Ordinance 2107 (§4.36), dated August 22, 2000 |
| 3 | 22-36 | Settlement Agreement and Release of Claims dated August 8, 2000 in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |
| 4 | 37-41 | Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/17/00 |
| 5 | 42-43 | Plaintiff's Acceptance of Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/27/00 |
| 6 | 44-57 | UPD Code §4.38, dated June 3, 2003 |
| 7 | 58-65 | Completion Report submitted by District to the United States Army Corps of Engineers, dated May 15, 2003 |
| 8 | 66-67 | Agenda Sheet of the Board of Port Commissioner's December 6, 2005 meeting regarding the A-8 Anchorage |
| 9 | 68-71 | Minutes from the December 6, 2005 Board of Commissioner's meeting |
| -- | 72-75 | *BLANK* |
| 10 | 76-84 | Agenda Sheet of the Board of Port Commissioner's May 2, 2006 meeting regarding the A-8 Anchorage |
| 11 | 85-91 | Minutes from the May 2, 2006 Board of Commissioner's meeting |
| 12 | 92-101 | Agenda Sheet of the Board of Port Commissioner's June 6, 2006 meeting regarding the A-8 Anchorage |
| 13 | 102-105 | Minutes from June 6, 2006 Board of Port Commissioner's meeting |
| 14 | 106-116 | Agenda Sheet of the Board of Port Commissioner's September 5, 2006 meeting regarding the A-8 Anchorage |
| 15 | 117-120 | Minutes from September 5, 2006 Board of Port Commissioner's meeting |
| 16 | 121-140 | Letter to John Gallagher from Ellen Gross Miles, dated July 6, 2007 |

**Gallagher v. San Diego Unified Port District, et al.**
**Case No. 08-CV-0886 IEG (RBB)**

## INDEX TO EXHIBITS (p. 2)

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 17 | 141-159 | Order Granting Defendants' Motion to Dismiss Without Prejudice, dated 4/4/07, in *Renard v. San Diego Unified Port District*, 06-CV-2665 H (BLM) |
| 18 | 160-196 | Plaintiff's Notice of Motion and Motion to Enforce Judgment, with accompanying documents, dated November 1, 2002, in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |

**EXHIBIT 10**

## *AGENDA ITEM 32*

# *SAN DIEGO UNIFIED PORT DISTRICT*

**DATE:**    May 2, 2006

**SUBJECT:    DISCUSSION OF THE A-8 ANCHORAGE, ALTERNATIVES AND DIRECTION TO STAFF**

### EXECUTIVE SUMMARY:

On December 6, 2005 the Board of Port Commissioners directed staff to commence public outreach to obtain input to resolve issues involving the A-8 Anchorage. Staff included all stakeholders in concerted efforts to find proactive, balanced, and long-term solutions to the issues identified. Globally, staff was asked to look at options available to turn the A-8 Anchorage into a safe and orderly place, to address environmental concerns, and to reduce the costs associated with the maintenance of the anchorage. Staff has addressed and analyzed the above-mentioned concerns; however, the data analysis led to the need to answer the threshold questions of whether the A-8 Anchorage should continue to exist and if so, whether it should continue to be free to users.

Based upon data obtained concerning public safety, environmental impacts, hazards to navigation, financial costs, public outreach meetings, public comments, survey results, as well as present and future development in San Diego Bay, staff is requesting Board guidance concerning these threshold questions and has formulated some long-term alternatives for discussion. Based on the Board's response, staff will conduct further investigation and analysis to formulate a recommendation for a long-term solution.

In the short term, staff recommends further exploration of potential changes to Unified Port District (UPD) Code §4.36 to improve current conditions. Staff would further recommend time to explore options and draft any proposed ordinance amendments, after seeking input from affected stakeholders and the public. If the Board direction is to amend UPD Code §4.36, staff will conduct further analysis and return with recommended implementation plans and revised code.

### RECOMMENDATION:

Discussion of the A-8 Anchorage, alternatives, and direction to staff.

### FISCAL IMPACT:

The full fiscal impact is unknown at this time and is dependent upon the option, or options, ultimately selected by the Board.

ACTION TAKEN:  05/02/06 - The Board gave direction to staff.

**AGENDA ITEM 32**

### DISCUSSION:

### Data requested by the Board

Staff was directed to provide the Board with an analysis on 1) the percentage of permanent A-8 Anchorage live-aboards (i.e., boats/navigable vessels that are also used as residences); 2) report on mooring operations; 3) sewage and trash impacts; 4) abandoned vessels; 5) registration of vessels, and 6) visual blight problems.    In response to such direction, staff provides the following data:

Item 1: Percentage of permanent A-8 Anchorage live-aboards - The number of vessels and live-aboard boats in the A-8 Anchorage changes daily. As of April 18, 2006 an inventory of the anchorage revealed 88 vessels anchored, and 83 persons living on 64 vessels. This equates to 73% of vessels with live-aboards.

Item 2: Report on mooring operations – See Attachment A. In summary, we have four mooring fields in the harbor, with 437 mooring buoys. There are currently 256 people on a waiting list to get a mooring buoy. The public is only allowed to be on one waiting list at a time. The monthly cost per mooring buoy ranges from a low of $119.57 to a high of $146.57, dependent upon the location.

Item 3: Sewage and trash impacts – The trash impact data can be found in Attachment B (Merkel & Associates, Inc. Debris Survey of the A-8 (80 acres) Anchorage taken on January 26, 2006). The report itemizes the dimensions of 248 objects; 112 objects are greater than 1 meter in size, but does not describe the objects in detail. Video footage and still footage of the area clearly show the type of debris, for example: pipe debris, boat hulls, batteries, a bicycle, and other miscellaneous debris ranging up to 14 meters. Debris surveys were also conducted in the A-2 (15 acres) and A-3 (47 acres) Anchorages in April 2006. 19 items and 14 items of debris, respectfully, were found in these mooring fields.

As for sewage impacts, the design of the discharge system of a marine sanitation device (MSD) is such that the discharge point is below the water line, making it difficult to observe violations. Staff is aware that in some regions, local authorities use dye pills to test MSD's, but does not recommend requiring the use of dye pills to detect discharge since the system can easily be circumvented.

Item 4: Abandoned vessels – As part of the public outreach meetings, staff has asked the public to call Harbor Police immediately upon seeing any vessel in distress and to not allow a vessel to either go adrift, become a hazard to navigation, or sink if preventable.

Item 5: Registration of vessels – As part of the permitting process, all vessels are required to be currently registered or federally documented. Staff recommends against

requiring vessel insurance to use the A-8 Anchorage, as it may not be legal to require it as a condition of boating in San Diego Bay.

Item 6: Visual blight problems - Issues of visual blight pertaining to excess materials visible on the decks of anchored vessels is currently addressed in UPD Code §4.08 (b) and may be used to enforce conditions of blight. Should the A-8 Anchorage be established as a mooring field it could be added to the list of anchorages regulated by this section. If not, this language could be added to the existing A-8 Anchorage Ordinance, UPD Code §4.36. UPD Code §4.08 (u) 6 states at pertinent part, "all construction materials, refuse, spare parts, surplus equipment or any other such material not needed for the direct operation of the vessel or the reasonable accommodation of the crew or passengers of the vessel shall be stored within an enclosed space on the vessel."

**Public Outreach**

Staff held three public outreach efforts to garner public input, ideas and comments on the issues involving the A-8 Anchorage, which were held in Chula Vista, National City and Coronado respectively. Staff also held a meeting to inform the public about the options on April 26, 2006 at the Don L. Nay Port Building. A representative from Katz & Associates facilitated all of the meetings. The majority of attendees at the public outreach meetings were A-8 Anchorage permit holders. They were asked to provide their opinions and potential solutions to the issues of public safety, environmental impacts, navigational hazards and financial costs associated with handling derelict vessels in the A-8 Anchorage. Both the facilitator and District staff from the Communications and Marketing departments captured public comments and input; where feasible, staff is considering implementing the suggestions, separate from the options provided herein for short-term changes. Participants were given additional opportunity to provide more input through a formal survey that was distributed at the meetings and also made available on the District's website by staff from the Strategic Management Services department. The public outreach survey results and public comments are available in the Clerk's Office.

**Issues Associated with A-8 Anchorage**

Crime data collected by the Harbor Police Department indicates that about 50 percent of all anchorage and mooring related crime reports, arrests and citations are issued in the A-8 Anchorage. Further, for the period of March 1, 2005 through February 28, 2006, 73% of all vessels towed and stored from an anchorage or mooring were from the A-8 Anchorage.

An analysis of Harbor Police statistics reveals approximately an estimated cost of $300,000 expended for public safety response and administration of the anchorage for the period from March 1, 2005 through February 28, 2006.

General Services has expended over $400,000 in managing and maintaining the A-8 Anchorage including the cost of its contract with South Bay Boatyard pertaining to the removal of abandoned, derelict and stored vessels from the A-8 Anchorage.

Commercial cargo growth at the Port has averaged 16% annually over the past 10 years. The annual growth of cargo at National City is currently exceeding 20% as a result of Pasha entering into a series of contracts with new and existing customers. Cargo vessels calling at National City often transit the channel adjacent to the A-8 Anchorage and the Sweetwater Channel in the early morning, pre-dawn hours. Maritime and the San Diego Bay Pilots are concerned that A-8 Anchorage boaters in dinghies impede the safe navigation of this area by large automobile vessels attempting to maneuver in this very narrow area.

The National City Marine Terminal is designated a "Strategic Port Facility" by the U.S. Maritime Administration to support military shipments as part of our national defense strategy. The U.S. Army has expressed support for providing federal funding for the expansion of the turning basin serving the Sweetwater Channel. This is needed to accommodate large military vessel operations at berths 24-10 and 24-11. The Federal government is also considering funding additional improvements such as rail and berth improvements, which would benefit both commercial and military operations. Staff is concerned that retaining the A-8 Anchorage in its present configuration, and location, and/or size could affect these funds and the value of San Diego as a "Strategic Port Facility".

Further, continuing any anchoring or mooring at the A-8 Anchorage may impede development of tidelands in National City such as the new National City Marina, proposed Aquatic Activity Center, and the future development of tidelands along National City and Chula Vista. An unlimited and free anchorage does not address navigational hazards, environmental impacts and mounting costs and demand for District resources required to maintain the status quo.

An open anchoring system, even for limited periods, invites derelict vessels that become adrift due to inadequate ground tackle, as well as vessel owners who move from limited period anchorage to limited period anchorage as a substitute for an unlimited place to anchor.

Any substantial change to the A-8 Anchorage will require the coordinated efforts of a number of entities such as the State Lands Commission (SLC), the Department of Boating and Waterways, the United States Coast Guard, and the member cities, especially the City of National City. In light of the time that will be required to effect this change, or even to add mooring buoys to an already existing mooring field, the Board should determine whether there is a need for an anchorage or mooring field of any kind at the A-8 Anchorage and if so, whether it should continue to be free to users.

If either elimination of the anchorage or a repeal of the "free" anchorage is approved by the Board, some current users of the A-8 Anchorage may be displaced. Currently, there

is an approximate 2-year waiting list for mooring buoys.   Additionally, some A-8 Anchorage user's vessels may not meet the more stringent regulations required to obtain a mooring buoy or they may be unable to afford a mooring buoy after being in the "free" A-8 Anchorage.

Because staff recognizes that elimination of the anchorage and/or the repeal of a "free" anchorage may impact some current users of the A-8 Anchorage, staff would make a concerted effort to identify and provide referral assistance to community resource points of contact to identify available assistance programs for anyone interested.  Further, because several of the long-term options being considered by staff will take some time to implement if approved, staff would establish a timeline to provide current users of the A-8 Anchorage with ample time to vacate the anchorage, and would issue no new permits to anchor after a date yet to be determined.

### Recommendations for Short –Term Changes

Due to the long-term nature and extent of the above issues and the time it could take to implement most of the long-term alternatives suggested below, staff recommends short-term changes to improve current conditions. As examples which are by no means exhaustive of options, the District could amend UPD Code §4.36 with the following alternatives, including but not limited to: fees for permitting and/or inspections, more strictly defining a "propulsion system", and more strictly defining an MSD.  Also, requiring permittees to abide by all federal, state, local laws pertaining to boating and anchoring and the terms of the anchoring permit, limiting the number of vessels to one per permitee, requiring a U.S. Coast Guard approved vessel safety check; including an incremental scale of fines for each successive towing and storage of vessels, and providing the District the ability to revoke or refuse to issue an anchoring permit under certain conditions relating to the conduct of the permittee in the anchorage, could be added.

In addition to the ordinance amendments, the District could cease or limit the issuance of permits to anchor in the A-8 Anchorage, and/or explore a boat recycling program. Staff would further recommend time to explore options and draft any proposed ordinance amendments, after seeking input from affected stakeholders and the public. If the Board direction is to amend UPD Code §4.36, staff will conduct further analysis and return with recommended implementation plans and revised code.

### Potential Long-Term Alternatives

In anticipation of direction from the Board, staff has begun to develop potential long-term alternatives for the A-8 Anchorage.

**1. Amend UPD Code §4.36 to more stringently regulate the A-8 Anchorage:** Should the Board recommend amendment of the A-8 Anchorage as a short-term solution and it proves satisfactory in ameliorating many of the issues in the A-8 Anchorage, the suggested amendments mentioned above could become permanent.

**_AGENDA ITEM 32_**

However, this option as a long-term solution would still require substantial District resources to manage and enforce, in the form of Harbor Police Department staffing, and would not eliminate increased patrol of the area because cursory observation of the anchorage cannot determine which vessels are anchored in conformance with the law.

**2. Amend UPD Code §4.08 to establish a mooring field in A-8:** Staff's survey data indicated that 52 percent of survey respondents favored a mooring field. Mooring buoys would make vessels anchored in the A-8 safer and secure, which has been a primary concern of the Board.   However, the establishment of a mooring field would eliminate the concept of a "free" A-8 Anchorage.   Many public speakers indicated a right or entitlement to a "free" anchorage. However, the concept of "free" is relative in that while it represents a lack of monetary cost to the inhabitants of the A-8 Anchorage, it does not extend to the costs incurred for public safety, environmental, maintenance by the District and in a larger sense, the public.  The establishment of a mooring field would still provide anchorage, for a cost.

The Port Master Plan requires public hearings for adding more than 100 vessels to the A-8 Anchorage and necessitates consultation with the District's member cities.  The Port Master Plan would need to be amended to allow mooring buoys in the A-8 Anchorage which would require approval by the Coastal Commission. Further, the District's lease with the SLC would need to be amended to permit any placement of mooring buoys in the A-8 Anchorage.  The District would need to obtain a permit from the Army Corps of Engineers and Regional Water Quality Control Board to actually install the mooring buoys, and an environmental review would also be necessary.

Finally, the landside impact of this option would be considerable.  Since the proposed development of the Aquatic Activity Center foresees using the existing dinghy dock and boat-launching ramp, permit holders of the A-8 would compete for its use.   The availability of restrooms and other public facilities would also have to be examined. Parking, which has long been a concern at Pepper Park especially with regard to the vessel owners using the A-8 Anchorage, could be even more problematic.

The capital outlay for this option could be costly.  Based upon staff's estimation, the approximately 80 acres comprising the A-8 Anchorage could hold from 140-240 mooring buoys. Staff estimates the cost per mooring buoy to be within a range of $5,000 to $7,000 per mooring buoy, which could ultimately be higher because the shallow waters of the A-8 Anchorage may require different construction than mooring buoys in other District mooring fields.

**3. Amend UPD Code to eliminate unlimited free anchoring in A-8 and add additional mooring buoys in other established mooring fields in the bay:** This option would eliminate the A-8 Anchorage, and would add additional mooring buoys in another established mooring field in San Diego Bay, such as the A-3 Anchorage located at the foot of Laurel Street.  Further, there is currently an unused portion of the A-4 Anchorage located on the other side of the Coronado Bridge which could be considered.

# AGENDA ITEM 32

However, this option would also present challenges. Increasing the number of mooring buoys in the A-3 Anchorage would add congestion to already crowded landside amenities and parking, again, is a concern. Review by the SLC and any lease amendments could be avoided if the District could re-configure moorings within the portion of A-3 under the District's jurisdiction.

With direction from the Board, staff will continue to work to further define the alternatives and long-term solutions.

**Port Attorney's Comments:**

Not applicable.

**Environmental Review:**

This presentation is not subject to CEQA, as amended.

**Equal Opportunity Program:**

Not applicable.

**PREPARED BY:**    Chief Kirk Sanfilippo, Harbor Police Department
Dirk Mathiasen, Director, Maritime Operations & Properties

Attachment A to Agenda Sheet No. 32

# Mooring Field Report

| Anchorage | Name | Mooring Balls | Fees/Details |
|---|---|---|---|
| A-3 | (SD Mooring Co.)<br><br>Laurel Street Roadstead /<br>Laurel Street Mediterranean | 154<br><br>(130)<br><br>(24) | Fee Schedule: (no time limit on length of stay)<br>Laurel St. Roadstead- $128.77/mth,  $65 application fee<br>Laurel St. Mediterranean- $137.72/mth, $69 application fee<br>Waiting list: 66 |
| A-9 | A-9 – Regulated by UPD Code §4.38.<br>UPD Code §4.40 Prohibits anchoring in North SD Bay outside of designated anchorages. | 20-25 boats | 3 mos/90 days max/yr - permit req. (renew permit every 30 days)<br>Visitors from out of county only- no tenants<br>Handicap (due to A-8)- 5 |
| A-2 | (SD Mooring Co.)<br>America's Cup Harbor<br>2 areas-<br>   - Small- rows B-J<br>   - Large- rows L-V | 170 | Fee Schedule: (no time limit on length of stay)<br>Small: $137.72/mth, $69 application fee<br>**Waiting List: 17**<br>Large: $146.57/mth, $72 application fee<br>**Waiting List: 81** |
| A-1 (a,b,c) | (SD Mooring Co.)<br><br>Shelter Island Roadstead | 44 | Fee Schedule: (no time limit on length of stay)<br>$119.57/mth, $60 application fee<br>Waiting List: 46 |
| A-1 | La Playa Cove – Regulated by UPD Code §4.38 | 25-40 | Open weekends & holidays only (this is due to the following):<br>-  Homeowners and Yacht Clubs suggested these hours<br>-  Youth sailing training held during the weekdays<br>Free for 48 hours |
| A-4 | (SD Mooring Co.)<br><br>Bay Bridge Roadstead (Coronado) | 69 | Fee Schedule: (no time limit on length of stay)<br>$119.57/mth, $60 application fee<br>Waiting List: 46 |
| A-5 | Glorietta Bay – Regulated by UPD Code §4.38.<br>UPD Code §4.35 prohibits anchoring in Central San Diego Bay outside of designated anchorage. | 20 boats | 72 Hour maximum length of stay anytime |
| A-6 | No longer exists<br>Formerly: Crown Point | | |
| A-8 | A-8 – Regulated by UPD Code §4.36 clarified the permit inspection process for anchorage.  UPD Code §4.35 prohibits anchoring in Central San Diego Bay outside of designated anchorage. | 120 boats | Free anchorage (renew permit every 6 months)<br>Unlimited length of stay<br>Restrictions: No longer than 65', seaworthy, self propelled, toilet, non commercial |

**EXHIBIT 11**

May 2, 2006                                                                   Page 134

and Director of Engineering and Project Development for the City of Coronado, who presented further details regarding the project.    (Copies of the staff report and presentation are on file in the Office of the District Clerk.)

Commissioner Cushman requested and received clarification regarding the location of the pipe.  Mr. Bensen responded that the pipe would be 30 feet under the bottom of the bay.

## DISCUSSION OF THE A-8 ANCHORAGE, ALTERNATIVES AND DIRECTION TO STAFF

Agenda Item 32.  Chief Kirk Sanfilippo, Harbor Police, addressed the Board and presented a brief overview of the issues surrounding the A-8 Anchorage, including details of public outreach meetings conducted by staff.    Dirk Mathiasen, Director, Maritime Properties and Operations, gave further details regarding potential long-term alternatives and recommendations for short-term changes.  (Copies of the staff report and presentation are on file in the Office of the District Clerk.)

The following individuals addressed the Board with varying viewpoints regarding this matter:  Gerald Payten; Dr. Richard Jorgensen; Captain Doc Barber, A-8 permittee; Charlie Ellery, representing the Portola Sail Yacht Club; Sat Gwin; and Donald Omsted.

Commissioner discussion ensued.  Commissioner Cushman requested that staff give the Board a recommendation.  Bruce Hollingsworth, Executive Director, responded that staff could find no philosophical reason why there could not be a free anchorage in San Diego Bay, but that staff could not identify resources to mitigate the costs of policing and cleaning up a free anchorage; therefore, staff recommends some type of modified mooring system be established at the A-8 Anchorage, which would take into account issues such as any increase in the turning basin, security, military load-outs on the Sweetwater Channel, and increased commercial and recreation operations out of the Sweetwater Channel.  Mr. Hollingsworth noted that with any solution the Board would need to take into account the impacts to individual boaters in the Anchorage who are in good standing.

Commissioner Cushman questioned the cost of $8,000 per mooring buoy as quoted in the staff report.  Commissioner Cushman expressed support of the following: adding two-point mooring buoys to the District's other mooring fields; continuing the increased patrol of the Anchorage by Harbor Police officers; widening the turning basin; installing additional mooring buoys at Grape Street mooring.    Commissioner Rios

commented on the cost to the District of providing a free anchorage, and suggested the District could save money by subsidizing the cost of mooring rentals for current boaters in the Anchorage.

Commissioner Hall expressed support of installing additional mooring buoys at the District's other mooring fields, and noted the possibility of allocating a portion of the additional mooring buoys as free. Commissioner Hall asked whether there might be some way to track the number of derelict vessels coming into A-8 Anchorage, such as camera placement. Chief Sanfilippo responded that staff had discussed recommending allowing only one boat in the Anchorage per person, and adding a camera. Commissioner Hall supported the low-cost Coast Guard Auxiliary inspections. Commissioner Vilaplana expressed concern regarding providing a free anchorage to a limited number of individuals while denying it to other boaters. Mr. Hollingsworth responded that there is more room for additional boaters in the Anchorage. Chief Sanfilippo offered further clarification that there is room for 100 vessels in the Anchorage, with approximately 90 boaters currently anchored there, and the Anchorage has at times been at capacity in the past.

Commissioner Valderrama noted that most of the boaters in the Anchorage are law-abiding citizens, but expressed concern at the number of crimes coming out of the Anchorage. Commissioner Valderrama expressed support for maximizing the number of mooring buoys at the District's other mooring fields. Commissioner Bixler discussed the cost to the District of installing mooring buoys and the cost to boaters of renting the buoys. Commissioner Bixler expressed support of directing staff to begin pursuing the legal right to add the maximum number of mooring buoys at A-8 Anchorage, but expressed concern that keeping an anchorage or mooring field in that location might not be a viable long-term solution. Commissioner Bixler discussed the cost of patrolling the A-8 Anchorage by Harbor Police, and the potential strain this puts on Harbor Police resources. Commissioner Bixler recommended the following: applying for the entitlement to the maximum number of buoys at A-8 Anchorage, without installing any buoys at this time; implementing staff's short-term recommendations; allowing expansions of A-3 and A-4 mooring fields to meet existing demands; and closing out and clearing out A-8 Anchorage over a period of six months to one year. Commissioner Bixler suggested that individuals from A-8 Anchorage be allowed to move to the new buoys at a fee determined by the installation cost amortized over an 8-year period, which would be approximately $83 per month, plus any standard mooring company fees.

Chairman Spane suggesting phasing in mooring buoys at the A-8 Anchorage, instead of adding more buoys to other mooring fields, as more study would be needed to determine the capacity of existing mooring fields and the impact of adding more buoys. Chairman Spane expressed support of continuing the increased Harbor Police patrol, and suggested directing staff to prepare a recommendation to the Board based on the Board's input. Commissioner Rios requested that staff explore the possibility of eliminating the A-8 Anchorage, adding mooring buoys to the District's other mooring fields, and relocating current A-8 tenants to the new buoys at a subsidized cost. Commissioner Hall requested a more thorough analysis of the cost of adding buoys, and suggested that staff explore maximizing other mooring buoys, including adding moorings in A-8 Anchorage. Commissioner Hall requested staff explore the feasibility of a low-cost inspection program to determine the seaworthiness of boats in the Anchorage. Commissioner Cushman made a motion to direct staff to bring a recommendation to the Board in 30 days, with two or three plans.

On motion of Commissioner Cushman, seconded by Commissioner Hall, the Board directed staff to report back to the Board in 30 days with recommendations for two or three plans that incorporate the various options suggested by the Commissioners, including but not limited to the following: converting A-8 Anchorage into a mooring field; adding two-point mooring buoys to the District's mooring fields; continuing the increased patrol of A-8 Anchorage by Harbor Police officers; subsidizing the cost of mooring rentals for current boaters in A-8 Anchorage or allocating a portion of new mooring buoys as free for A-8 permit holders; and providing low-cost boat inspections, by the following vote: Yeas-Bixler, Cushman, Hall, Rios, Spane, Valderrama, Vilaplana; Nays-None; Excused-None; Absent-None; Abstained-None.

Chairman Spane announced that the Board would take a 15-minute break before continuing to the next item.

Chairman Spane called the meeting back to order at 4:15 p.m.

## PRESENTATION BY SEAPORT VILLAGE OPERATING CO., LLC OF PRELIMINARY PLAN UPDATE FOR OLD POLICE HEADQUARTERS ADAPTIVE REUSE

Agenda Item 29. Bruce Walton and Cindy Blair, representing Seaport Village Operating Co., addressed the Board and presented a preliminary plan update for the Old Police Headquarters project. (Copies of the staff report and presentation are on file in the Office of the District Clerk.)

In response to an inquiry from Commissioner Cushman regarding the number of leases signed to date, Mr. Walton stated that the lease option does not require that any leases be signed until the end of the option period; but stated that Seaport Village Operating Co. has commitments for approximately half of the building from a Letter of Interest for the assembly building; GMS, who will occupy the public market; and the police museum.   Mr. Walton added that, with the exception of any force majeure events, GMS would sign the lease with the District and would begin construction regardless of the number of subleases signed.   Commissioner Cushman requested that if at any time GMS believes there may be circumstances that would cause GMS to reconsider entering into the lease, that GMS report to the Board immediately.

## PRESENTATION BY SUNROAD ASSET MANAGEMENT, INC. OF REVISED CONCEPTUAL PLAN FOR THE REDEVELOPMENT OF EAST HARBOR ISLAND

Agenda Item 30.   Chairman Spane announced that this item would be continued to a future Board meeting.

## PRESENTATION BY VIEJAS ENTERPRISES REGARDING CHANGES TO ITS DEVELOPMENT TEAM FOR THE LANE FIELD-B STREET PIER-1220 PACIFIC HIGHWAY PROJECTS

Agenda Item 31.   Karen Weymann, Assistant Director, Real Estate, addressed the Board and presented a brief overview of the Lane Field-B Street Pier-1220 Pacific Highway Project (Project).   Ms. Weymann introduced Frank Riolo, Viejas Enterprises (Viejas), who gave further details regarding the proposed changes to the development team for the Project.        Perry Dealy, representing Manchester Financial Group (Manchester), discussed his firm's interest in the Project.   (Copies of the staff report and presentation are on file in the office of the District Clerk.)

Commissioner discussion ensued.   In response to an inquiry from Chairman Spane, Ms. Weymann stated that staff's recommendation is to continue negotiations with Viejas along the current lines, as it would be the fastest way to move forward with the Project.   Commissioner Rios asked whether the new development team would present a revised design and timeline.   Mr. Riolo responded that the team plans to continue with the existing designs.   Mr. Dealy discussed the 1220 Pacific Highway property that would need to be addressed in conjunction with the Lane Field project, and briefly discussed the proposed timeline for the Project.   Commissioner Vilaplana expressed support of the pairing of Viejas with Manchester for this Project, and

suggested a coordinated planning effort throughout the various properties in the Project.

In response to an inquiry from Commissioner Cushman regarding whether the Board might not consider just having Manchester complete the Project without Viejas, Mr. Riolo discussed the different strengths that Viejas and Manchester would contribute to the Project. In response to further inquiry from Commissioner Cushman regarding the financial commitment of Viejas, Mr. Riolo estimated an investment of no less than $10 Million ("eight figures"). In response to inquiry from Commissioner Cushman regarding tribal sovereignty, Mr. Riolo stated that Viejas would form an LLC entity specifically for this Project, which would fall under the jurisdiction of the State. Commissioner Cushman expressed concern regarding Manchester's financial commitments with respect to other large developments in the area, and asked why Manchester would not just do the project alone, without Viejas. Mr. Dealy discussed the strengths and contributions that Viejas would bring to the partnership. Commissioner Cushman suggested that the Viejas/Manchester team should submit a $1 Million non-refundable deposit, and a $50,000 per quarter non-refundable deposit during the 24-month option period, with no best-efforts clause in the agreement. Mr. Dealy responded that Manchester would consider agreeing to such terms, as long as those funds would be incorporated into the expenses of the Project. Commissioner Cushman asked whether Manchester would be willing to advance $26 Million for the 1220 Pacific Highway property. Mr. Dealy responded that Manchester would be willing to negotiate with the Navy directly for that property.

In response to an inquiry from Commissioner Cushman regarding negotiations with Viejas/Manchester, Ms. Weymann stated that staff would like 90 days to conduct negotiations with Viejas/Manchester. In response to further inquiry from Commissioner Cushman regarding the deposits, Ms. Weymann stated that Manchester had originally submitted a refundable $100,000 deposit with the original proposal, but the $100,000 that Viejas has submitted was non-refundable. Commissioner Cushman suggested that Manchester submit a $100,000 non-refundable deposit. Mr. Dealy presented a counter-offer of $50,000. Commissioner Cushman made a motion to authorize staff to enter into an Exclusive Negotiating Agreement for 90 days, with Manchester to submit a $50,000 non-refundable deposit. Bruce Hollingsworth, Executive Director, requested clarification regarding Manchester's original $100,000 deposit. Commissioner Cushman explained that the District would refund Manchester's original deposit, as well as the deposits submitted by the other teams that submitted proposals.

Commissioner Valderrama expressed concern regarding the number of projects currently underway with Manchester, and the resulting financial obligations. With respect to the cruise ship terminal, Commissioner Bixler discussed the priorities of providing a suitable place to embark and disembark, parking, bus accommodations, and baggage handling, and suggested that retail might not be an appropriate use, as parking might bring in more revenue. Ms. Weymann responded that some retail might be appropriate, or a restaurant, and that there are plans to increase the amount of parking at that location. Commissioner Bixler stated that there should be efficient baggage handling located somewhere besides Broadway. In response to an inquiry from Commissioner Bixler regarding the approval of a parking site, Mr. Hollingsworth stated that it might be possible to continue receiving rental car fees in order to pay for a parking structure to accommodate the uses being proposed with the Project. Commissioner Bixler suggested Viejas/Manchester consider a parking structure at the intersection of Pacific Highway and Harbor Drive in partnership with the District. Commissioner Hall and Chairman Spane both expressed support of the pairing of Viejas and Manchester.

On motion of Commissioner Cushman, seconded by Commissioner Hall, the Board directed staff to enter into an Exclusive Negotiating Agreement (ENA) with the Viejas Enterprises/Manchester Financial Group team to negotiate a 24-month Option to Lease Agreement; with Viejas Enterprises/Manchester Financial Group to provide a $1 Million non-refundable deposit, as well as a $500,000 non-refundable deposit per quarter during the 24-month Option period; with the agreement to contain no best-efforts clause but actual deadlines and a timeline, as well as a completion guarantee; with Viejas Enterprises/Manchester Financial Group to consider financing the purchase of the U.S. Navy's interest in the 1220 Pacific Highway property in exchange for rent credits; with the other teams who submitted proposals and deposits for the Project to be refunded those deposits; and with Manchester Financial Group to submit a $50,000 non-refundable deposit as part of the 90-day ENA, by the following vote: Yeas-Bixler, Cushman, Hall, Rios, Spane, Valderrama, Vilaplana; Nays-None; Excused-None; Absent-None; Abstained-None.