**Gallagher v. San Diego Unified Port District, et al.**
**Case No. 08-CV-0886 IEG (RBB)**

## INDEX TO EXHIBITS

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 1 | 1-8 | Agenda Sheet of the Board of Port Commissioner's meeting regarding §4.36, dated August 22, 2000 |
| 2 | 9-21 | Original Ordinance 2107 (§4.36), dated August 22, 2000 |
| 3 | 22-36 | Settlement Agreement and Release of Claims dated August 8, 2000 in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |
| 4 | 37-41 | Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/17/00 |
| 5 | 42-43 | Plaintiff's Acceptance of Third Offer of Judgment in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH), dated 11/27/00 |
| 6 | 44-57 | UPD Code §4.38, dated June 3, 2003 |
| 7 | 58-65 | Completion Report submitted by District to the United States Army Corps of Engineers, dated May 15, 2003 |
| 8 | 66-67 | Agenda Sheet of the Board of Port Commissioner's December 6, 2005 meeting regarding the A-8 Anchorage |
| 9 | 68-71 | Minutes from the December 6, 2005 Board of Commissioner's meeting |
| -- | 72-75 | *BLANK* |
| 10 | 76-84 | Agenda Sheet of the Board of Port Commissioner's May 2, 2006 meeting regarding the A-8 Anchorage |
| 11 | 85-91 | Minutes from the May 2, 2006 Board of Commissioner's meeting |
| 12 | 92-101 | Agenda Sheet of the Board of Port Commissioner's June 6, 2006 meeting regarding the A-8 Anchorage |
| 13 | 102-105 | Minutes from June 6, 2006 Board of Port Commissioner's meeting |
| 14 | 106-116 | Agenda Sheet of the Board of Port Commissioner's September 5, 2006 meeting regarding the A-8 Anchorage |
| 15 | 117-120 | Minutes from September 5, 2006 Board of Port Commissioner's meeting |
| 16 | 121-140 | Letter to John Gallagher from Ellen Gross Miles, dated July 6, 2007 |

**Gallagher v. San Diego Unified Port District, et al.**
**Case No. 08-CV-0886 IEG (RBB)**

## INDEX TO EXHIBITS (p. 2)

| EXHIBIT | PAGE(S) | DOCUMENT |
|---------|---------|----------|
| 17 | 141-159 | Order Granting Defendants' Motion to Dismiss Without Prejudice, dated 4/4/07, in *Renard v. San Diego Unified Port District*, 06-CV-2665 H (BLM) |
| 18 | 160-196 | Plaintiff's Notice of Motion and Motion to Enforce Judgment, with accompanying documents, dated November 1, 2002, in *Gallagher v. San Diego Unified Port District*, 98-CV-0615 J (JAH) |

**EXHIBIT 12**

**AGENDA ITEM 28**

## SAN DIEGO UNIFIED PORT DISTRICT

**DATE:**     June 6, 2006

**SUBJECT: APPROVAL OF STAFF'S RECOMMENDATION TO INSTALL ADDITIONAL MOORING BUOYS IN ESTABLISHED MOORING FIELDS, DISCUSSION, AND DIRECTION TO STAFF**

### EXECUTIVE SUMMARY:

On May 2, 2006 the Board of Port Commissioners directed staff to prepare two to three proposals, including staff's recommendation, to resolve the issues associated with the A-8 Anchorage.

Based upon data obtained through staff analysis, research, and public outreach, staff has formulated long and short-term proposals for the Board's consideration. These proposals address issues associated with public safety, environmental impacts, potential displacement of the A-8 Anchorage boating community, hazards to navigation, financial costs, as well as present and future development in San Diego Bay.

In formulating the proposals, staff made assumptions to create a standard to evaluate all options. These assumptions are: 100 additional mooring spaces would be used for cost calculations and implementation, environmental remediation of A-8 would be necessary regardless of the option, and there would be a potential for recovery of capital outlay, and that free, unlimited anchoring would be eliminated.

After establishing criteria and conducting a decision analysis, staff developed five (5) options to address the issues involving the A-8 Anchorage. They are:

1.    Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage.
2.    Return the A-8 Anchorage to open water uses only, eliminating free unlimited anchoring.
3.    Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field.
4.    Develop new mooring fields in San Diego Bay.
5.    Install a mooring field in the A-8 Anchorage.

After analysis of all options, staff recommends Board consideration of the following three (3) proposals, and approval of the first proposal:

1.    Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage.
2.    Return the A-8 Anchorage to open water uses only, eliminating free unlimited anchoring.
3.    Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field.

ACTION TAKEN:  06/06/06 - The Board gave direction to staff.

## AGENDA ITEM 28

### RECOMMENDATION:

Approve staff's recommendation to install additional mooring buoys in established mooring fields, discussion, and direction to staff.

### FISCAL IMPACT:

The full fiscal impact is unknown at this time and is dependent upon the option ultimately selected by the Board.

### DISCUSSION:

At the Board meeting on May 2, 2006, staff sought direction from the Board on two threshold questions: 1) whether the A-8 Anchorage should continue to exist; and 2) if so, whether it should continue to be free to users. The Board directed staff to return to the Board within thirty days with two to three proposed solutions, including staff's recommendation, to resolve the issues associated with A-8 Anchorage.

After establishing criteria and conducting a decision analysis, staff developed five (5) options to address the issues involving the A-8 Anchorage. They are:

1.  Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage.
2.  Return the A-8 Anchorage to open water uses only, eliminating free unlimited anchoring.
3.  Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field.
4.  Develop new mooring fields in San Diego Bay.
5.  Install a mooring field in the A-8 Anchorage.

After consideration of all options, staff recommends Board consideration of the following three (3) proposals, in order of their preference:

1.  Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage.
2.  Return the A-8 Anchorage to open water uses only, eliminating free unlimited anchoring.
3.  Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field.

### Public Outreach

In addition to the four public outreach meetings held to obtain public input, ideas and comments on the issues involving the A-8 Anchorage, a public meeting was held on May 31, 2006 to inform the public of the options and proposals to be presented to the

## AGENDA ITEM 28

Board at the June meeting. A representative from Katz & Associates facilitated all of the meetings. The May 31st meeting will be discussed during the Board meeting.
**Data requested by the Board**

At the May 2nd meeting, staff was directed by the Board to address the following: 1) the potential displacement of the A-8 Anchorage boating community; and 2) the current mooring and anchorage availability in San Diego Bay, and determination of potential capacity.

Item 1: ˙ Potential displacement of the A-8 Anchorage boating community – staff researched the following:

A.    Voucher program: The Board directed staff to look into establishing a voucher program to assist the current A-8 Anchorage boating community with the transition to a mooring buoy, should additional mooring buoys be installed. Staff does not recommend establishing a voucher program as the Port Attorney's office has opined that it would constitute a gift of public funds but does recommend giving the A-8 Anchorage boating community adequate time to continue to anchor in the A-8 Anchorage, subject to applicable ordinance and permit requirements.

B.    Current mooring buoy wait lists: Currently, 275 people are on the waiting list for a mooring buoy in San Diego Bay. Approximately three (3) to ten (10) boaters from the A-8 Anchorage are currently on the list. Should the A-8 Anchorage be established as a mooring field or additional mooring buoys be installed in established mooring fields, staff would need to determine the number of vessels currently in the A-8 Anchorage that would qualify for a mooring buoy, should a vessel owner desire one.

C.    Referral Assistance to social service points of contact: Staff has been in contact with social service departments and will provide contact information to those interested. In addition, a social services representative will be in attendance at the June 6th Board meeting to answer any questions the Board may have concerning available social service resources.

Item 2: Current mooring and anchorage availability in San Diego Bay and determination of potential capacity – staff researched the following:

A.    Current mooring buoy wait lists: Currently, 275 people are on the waiting list for a mooring buoy in San Diego Bay. Of those on the current wait list, it is estimated that 91 are on a buoy, 62 are in San Diego marinas, 45 are in out of town marinas, 37 do not have a vessel, 19 are subleasing a mooring buoy from San Diego Mooring Company, 11 are storing vessels on land, and 3-10 vessels are in the A-8 Anchorage. Therefore, only 40 additional mooring buoys appear to be required, in addition to the unknown number of A-8 Anchorage permit holders who may qualify for a mooring buoy.

## AGENDA ITEM 28

B.    Security and navigational concerns:  Current security zone markers, for a military load out, extend into the A-8 Anchorage.  To address this, the anchorage boundaries could be relocated to accommodate the security zone requirement of 1600 feet from the face of the Marine Terminal, further west, or anchoring could be prohibited in the A-8 Anchorage.  Relocating the anchorage boundaries to accommodate the security zone requirement would reduce the size of the A-8 Anchorage from 80.35 acres to 60.77 acres.

C.    Single point versus dual point moorings:  Single point moorings are better suited than dual point moorings for securing vessels in an open bay or unsheltered area.  With single point moorings, the vessel is moored from its bow to the mooring.  This allows the vessel to point into the wind and waves, and reduces wind/wave stresses on the vessel and mooring, but requires a large swing radius for the vessel to pivot about its moorings.  Dual point moorings secure the vessel by both its bow and stern.  The vessel is oriented in one direction and cannot swing freely into the wind and waves.  This mooring is more suited to sheltered areas, allows a greater number of vessels to be accommodated for a given size area, but has a greater construction cost than a single point mooring.

D.    Needed infrastructure improvements for additional moorings:    Landside infrastructure consists of restrooms, dinghy docks, pump-out stations, trash receptacles, and parking.  It would be optimal to install additional mooring buoys in areas where the least amount of landside infrastructure improvements would be necessary.

E.    Recovering the costs of the mooring buoys:  Should additional mooring buoys be installed in the Bay, the District could recover the costs of the mooring buoys over time.  Specifically, the District could initiate a contract with a private mooring company who would be responsible for the rental and maintenance of the mooring buoys; the capital costs would be recovered from the rent received on the mooring buoys.  The amount needed to repay the District for the costs of the additional mooring buoys depends upon the profitability of the mooring buoy.  The "cost recovery payment" should be large enough to recover the costs quickly (i.e., between three to five years) while providing the mooring company with net rental income sufficient to support the maintenance and repairs of the buoys.  The "cost recovery payment" would need to be negotiated between the District and the private mooring company.  Once the capital costs of the mooring buoys have been fully recovered, the private mooring company would then own the mooring buoys.  Preliminary analysis indicates that this type of cost recovery structure could be profitable to the mooring company over the term of a twenty-year lease.  The District could also enter into a design/build contract with a third party.

**AGENDA ITEM 28**

### Long-Term Options

Staff has prepared the following options, including staff's recommendation, to resolve the issues associated with the A-8 Anchorage. The five potential options are:

1.    Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage.
2.    Return the A-8 Anchorage to open water uses only, eliminating free unlimited anchoring.
3.    Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field.
4.    Develop new mooring fields in San Diego Bay.
5.    Install a mooring field in the A-8 Anchorage.

A decision analysis was conducted on each of the following long-term proposed options, evaluating the following criteria developed by staff:

1.    Enhance the safety for all stakeholders,
2.    Enhance the administration of the anchorages,
3.    Minimize the negative environmental impact of the anchorages,
4.    Reduce the overall expenditure of public funds,
5.    Maximize maritime security and minimize navigational concerns, and
6.    Optimize the use of current infrastructure.

The following is analysis of each of the options:

### 1. Install additional buoys in established mooring fields only and eliminate anchoring in the A-8 Anchorage:

This option best addresses the overall needs of the boating community and the Port. Additional moorings in existing fields have the least impact on infrastructure if the moorings are incrementally added to different fields in phases. The addition of additional mooring buoys to established mooring fields in San Diego Bay may adequately serve the needs of the boating community without changing the A-8 Anchorage to a mooring field, especially in light of the fact that this is the least desirable location for a mooring field in San Diego Bay due to the long distance to shore, high winds, military security zones, and the navigational challenges of the channel.

The potential risks of eliminating the unlimited, free anchorage, include: the potential to upset the boating community in the A-8 Anchorage and the remaining mooring fields due to increased density, and, impact to infrastructure in the established mooring fields. Mitigation options to overcome the risks include: spreading the new buoys across multiple fields to minimize infrastructure impacts, installing additional buoys in phases as needed, and conducting public outreach sessions to obtain information and suggestions.

**AGENDA ITEM 28**

There are several potential benefits to adding buoys to established mooring fields, which include: providing additional moorings for boaters at a low cost, reducing the current impacts at Pepper Park, and allowing for more proactive patrol time for Harbor Police, versus reactive (i.e., responding to calls for service in the A-8 Anchorage). If the A-8 area is returned to open water, Harbor Police resources can be used in other areas of the bay and the reduction of costs in the contract for towing of abandoned or sunk vessels by South Bay Boat Yard.

Due to the above reasons, staff recommends moving forward with installing additional mooring buoys in established mooring fields and eliminating anchoring in the A-8 Anchorage.

To accomplish this, a study to determine the exact locations and numbers of buoys to install will be required. Public outreach will be conducted to determine the appropriate number of moorings required. The table below outlines the current and potential capacity of the anchorage sites capable of accommodating additional mooring buoys:

| Anchorages Available for Addition | Acreage | Current Mooring Quantity | Potential Mooring Buoy Additions | Total Capacity |
|---|---|---|---|---|
| A-3 (Laurel Street Roadstead) currently a mooring field | 56.91 | 154 | 8 (SP) 12 (M) 20 Total | 174 |
| A-4 Anchorage (Bay Bridge Roadstead) currently a mooring field | 44.50 | 69 | 50 (SP) | 119 |
| **Total** | | 223 | 58 (SP) + 12 (M) = 70 | **293 (SP/M)** |

Guide:

SP= Single Point Mooring
M= Mediterranean Mooring (along the sea wall)

The A-1 Anchorage located at La Playa Cove on Shelter Island is a 72-hour anchorage and is not feasible as a mooring field because of environmental sensitivity. The A-1 Anchorage is also used by surrounding yacht clubs and other groups for the staging of youth boating activities and races. Likewise, the A-5

## AGENDA ITEM 28

*Page 7 of 10*

Anchorage located in Glorietta Bay is also a 72 hour anchorage. The A-9 Anchorage is known as the "cruiser's anchorage" and affords out of county visitors free anchorage of up to 90 days. These three anchorages were not analyzed because they are not currently mooring fields and because they constitute a special use providing free anchorage, which is in demand due to location. Finally, the A-7 Anchorage located in Crown Cove on the Silver Strand is not considered a viable option because of the extremely sensitive environmental area and its location in a California State Park.

**A-3 Anchorage (Laurel Street Roadstead):**

Approximately 8 single point moorings can be added to the existing anchorage. Onshore, a public restroom and three dinghy docks provide for the landing needs of users. Staff is still exploring the potential to add 12 Mediterranean moorings along the crescent; however, added construction costs of wharf improvements for the Mediterranean style moorings may make this addition cost prohibitive.

**A-4 Anchorage (Bay Bridge Roadstead):**

The A-4 Anchorage sits north of the Coronado Bay Bridge and presently consists of 23 acres (69 boats). South of the Coronado Bay Bridge is an expansion area of 21.5 acres of water area. The entire 21.5 acres is not completely developable into a mooring field because of shallow areas, but staff estimates that about 50 vessels at single point anchoring could be accommodated. A dinghy dock on the beach and a rest room in Tidelands Park to the north of the bridge is available to the boaters. Expansion would require the construction of a dinghy dock, but parking in the Coronado Tidelands Park would likely be adequate.

## 2. Return the A-8 Anchorage to open water use only, eliminating free unlimited anchoring:

Eliminating the A-8 Anchorage and returning the area to open water use, decisively met all of the long-term criteria set forth above. However, this option does not accommodate the current wait list for mooring buoys, address future mooring needs, and offers no mitigation for the potential displacement of the current A-8 Anchorage boating community. Therefore, despite its appeal in terms of enhancing safety, the administration of the anchorage, minimizing negative environmental impacts, reducing the overall expenditure of public funds, maximizing maritime security, and minimizing navigational concerns, the complete elimination of the A-8 Anchorage without any mitigation or creation of new space for boaters could also eliminate new opportunities for boaters in San Diego Bay. This change would also eliminate the requirement for disabled boater permitting currently available in the A-9 Anchorage.

## 3. Install additional mooring buoys in established mooring fields and establish some or all of the A-8 Anchorage as a mooring field:

## *AGENDA ITEM 28*

This option would add mooring buoys to some or all of the A-8 Anchorage as well as in the other established mooring fields in San Diego Bay.    Infrastructure improvements may be required, based on the number of buoys installed, and this proposal would not eliminate the safety and navigational challenges in the Sweetwater Channel. Further, due to the location of the A-8 Anchorage, boaters may not find it appealing enough to pay to moor. Adding mooring buoys to the A-8 Anchorage would take time to implement due to permitting and construction constraints. There may also be issues concerning the type of mooring that could be used in the A-8 Anchorage due to its shallow depth, which could increase the cost of construction.

### 4. Develop new mooring fields in San Diego Bay:

This proposal would require the establishment of landside infrastructure in any location selected to install mooring buoys at an unknown cost and would take the longest to implement due to permitting and construction constraints. On the positive side, it is possible that the establishment of a new mooring field could be in a more desirable location; however, this opportunity did not outweigh the difficulties and potential costs.

### 5. Install a mooring field in the A-8 Anchorage:

Survey data indicated that 52 percent of respondents favored a mooring field. However, the establishment of a mooring field would eliminate the concept of a "free" A-8 Anchorage. Many public speakers indicated a right or entitlement to a "free" anchorage. However, being as that option is no longer feasible given all the issues, costs, and concerns associated with the A-8 Anchorage, the establishment of a mooring field would still provide mooring, albeit for a cost. The same challenges would be present with this option as set forth in options 3 and 4 above.

### Timeline for Proposals

Staff projects that based upon the Board's decision, project planning and public outreach could be completed in three (3) months. Thereafter, staff estimates that the permitting process could take up to ten (10) months, and the time from award of a contract for construction and installation of the mooring buoys to take five (5) months, for a total of 18 months. The unknown variable is the amount of time it would take to amend the Port Master Plan and obtain California Coastal Commission approval, which could extend the timeline by an estimated six (6) months. Therefore, staff's estimate of the total timeline is approximately 18 –24 months. Out of the three proposals, it is estimated that installing additional mooring buoys in already established mooring fields would be the most expedient (after the outright elimination of the A-8 Anchorage), in that it would not require Port Master Plan Amendment and the requisite California Coastal Commission approval.

Based upon all of the above, staff recommends that the Board approve the long term option of installation of additional mooring buoys in established mooring fields,

eliminating anchoring in the A-8 Anchorage, and approve staff returning with amendments to UPD Code Section 4.36 for short-term management and regulation of the A-8 Anchorage.

**Short-Term Ordinance Amendments**

Separate from the long-term considerations, staff recommends amending UPD Code §4.36, which regulates the A-8 Anchorage as follows:

- Impose a security deposit, fee and/or insurance as a condition of obtaining an A-8 Anchorage permit.
- Stop issuing new A-8 Anchorage permits. Existing permit holders will be able to renew their six (6) month permits subject to meeting permit requirements; however, should an A-8 Anchorage permittee leave the anchorage or change vessels, no new permit will be issued in its place.
- Allow the required vessel inspections to be conducted by the US Coast Guard Auxiliary to the extent practicable. If not practicable (based upon Auxiliary availability/workload) staff or a third party will be available to conduct the required inspections.
- Allow District staff to place dye tablets in any Marine Sanitation Device.
- Condition the refusal to issue a permit or revoke an existing permit based upon vessel owner misconduct, including the abandoning or grounding of vessels.
- Limit the number of vessels to one per permittee.
- If adopted by the Board, these new amendments would also apply to disabled boaters currently permitted and anchored in the A-9 Anchorage.

The recommendations below would not require amending the ordinance:

- Increase the enforcement of speed limit violations in the A-8 Anchorage area.
- Establish a neighborhood watch program for the A-8 Anchorage boating community.

Staff is moving forward with scheduling and conducting public outreach on the ordinance amendments. Staff anticipates bringing proposed amendments to UPD Code Section 4.36 to the Board for approval at its meeting on August 8, 2006. If approved by the Board, the amended ordinance would be effective and enforceable thirty (30) days later.

**Port Attorney's Comments:**

The Port Attorney's office has reviewed this agenda sheet and has advised staff on legal issues concerning the various options and proposals. After consideration, the Port Attorney's office recommends against establishing a voucher program as it would constitute a gift of public funds.

## *AGENDA ITEM 28*

**Environmental Review:**

This action is not subject to CEQA, as amended.

**Equal Opportunity Program:**

Not applicable.

**PREPARED BY:**    Chief Kirk Sanfilippo, Harbor Police Department
Dirk Mathiasen, Director, Maritime Operations & Properties

**EXHIBIT 13**

## PRESENTATION OF CERTIFICATES OF RECOGNITION TO PORT TENANTS, HUMPREY'S HALF MOON INN AND SUITES AND SUN HARBOR MARINA, FOR PROVISION OF PUBLIC ART ON THEIR LEASEHOLDS

Agenda Item 27. Paul Fanfera, Senior Director, Real Estate, briefly discussed the success of the District's public art program.  Mr. Fanfera introduced Anthony Bloc, Chairman of the District's Public Art Committee, who presented Certificates of Recognition to Richard Bartell of Bartell Hotels and Mary Lou LoPreste of Sun Harbor Marina for the installations of public art on their respective properties.  Mr. Bloc thanked Mr. Bartell and Ms. LoPreste on behalf of the Public Art Committee and the District. Chairman Spane commended Catherine Sass, Director, Public Art, and the Public Art Committee for their advancement of the District's public art program.

## APPROVAL OF STAFF'S RECOMMENDATION TO INSTALL ADDITIONAL MOORING BUOYS IN ESTABLISHED MOORING FIELDS, DISCUSSION, AND DIRECTION TO STAFF

Agenda Item 28. Chief Kirk Sanfilippo, Harbor Police, addressed the Board and presented a brief overview of the issues surrounding the A-8 Anchorage. Dirk Mathiasen, Director, Maritime Properties and Operations, discussed the details of staff's recommendations for short-term and long-term solutions.  (Copies of the staff report and presentation are on file in the Office of the District Clerk.)

The following individuals addressed the Board with varying viewpoints regarding this matter:  Charlie Ellery; Don Omsted; Captain Doc Barber; Sat Gwin; and Lawrence Graf.

Commissioner discussion ensued.  Commissioner Cushman expressed support of staff's recommendation.   In response to an inquiry from Commissioner Cushman regarding the emergency police moorings, Pete Cruz, Director, General Services, reported that staff has submitted the necessary applications, and that the District's Environmental and General Services departments are working on the issue. Commissioner Cushman requested that staff provide an update to the Board on the progress of the installation of emergency police moorings.   Commissioner Rios expressed support of staff's recommendation, and suggested that staff could further explore a program to financially assist boaters in the Anchorage during the transition, perhaps through the Financial Assistance Program.  Commissioner Vilaplana expressed support of staff's recommendation and requested clarification regarding an insurance requirement.     Ellen Gross Miles, Deputy Port Attorney, responded that the

recommendation is to offer the ability to provide proof of insurance as an alternative to a security deposit.

Commissioner Bixler discussed the ongoing Harbor Police enforcement activity in the Anchorage, and expressed support of staff's recommendation. In response to an inquiry from Chairman Spane regarding proposed changes to District Code, Ms. Gross Miles stated that the short-term amendments to Section 4.36 of the District Code would apply to the A-8 Anchorage only because of the free, unlimited and long-term nature of the permit holders there.    Ms. Gross Miles offered further clarification that the short-term anchorages in the Bay are intended for out-of-town boaters who would only be in the area for a limited time, and the security deposit requirements would be onerous for those boaters; and that the other anchorages do not have problems with abandoned and derelict vessels. Chairman Spane stated that he did not support staff's recommendation, and that the proposals did not take into consideration all of the potential consequences. Chairman Spane suggested voting on the short-term proposals and the long-term proposals separately.

Commissioner Valderrama expressed support of staff's recommendation and requested a provision for the existing A-8 boaters to have first choice of new mooring buoys. Ms. Gross Miles responded that staff would propose that A-8 boaters be given the right of first refusal, provided they meet the criteria for the mooring buoy permits. Commissioner Hall expressed support of splitting the vote into two items, and commented on the need for a transition plan for the current permitees in the Anchorage. Duane Bennett, Port Attorney, stated that although the idea of a voucher could be deemed a gift of public funds, staff could research statutory requirements that pertain to affordable housing, condo conversions and public assistance, to ascertain if, by analogy, staff could create some type of assistance for boaters who live in the Anchorage. Bruce Hollingsworth, Executive Director, pointed out that the District Act officially prohibits residential uses on District property.    Chairman Spane expressed concern that staff has not had adequate time to address all of the issues, and suggested continuing the item for 30 days.

Commissioner Cushman made a motion to accept staff's recommendation, and added that staff should report back to the Board in 90 days on the proposed regulations to be amended in District Code Section 4.36, and any additional concerns. Commissioner Vilaplana seconded the motion. Mr. Hollingsworth clarified the motion as follows: 1) staff would continue to explore some type of voucher or assistance program for current residents in the A-8 Anchorage; 2) staff would come up with a provision that current permit holders be given the right of first refusal if they meet the permit

requirements for a mooring buoy; 3) staff would implement the proposals, as outlined in the staff report, to install additional mooring buoys in established mooring fields and to implement short-term regulations in the Anchorage; and 4) staff would report back to the Board in 90 days with an update on the proposed amendments to District Code Section 4.36.

On motion of Commissioner Cushman, seconded by Commissioner Vilaplana, the Board accepted staff's recommendation and directed staff to install additional mooring buoys in established mooring fields, to eliminate anchoring in the A-8 Anchorage, to proceed with the short-term amendments to District Code Section 4.36, to increase the enforcement of speed limit violations in the A-8 Anchorage area, to establish a neighborhood watch program for the A-8 Anchorage boating community, to explore a voucher or assistance program for current residents in the A-8 Anchorage, to establish a provision that current permit holders be given the right of first refusal if they meet the permit requirements for a mooring buoy, and to report back to the Board in 90 days with an update on the proposed amendments to District Code Section 4.36, by the following vote:  Yeas-Bixler, Cushman, Rios, Valderrama, Vilaplana; Nays-Hall, Spane; Excused-None; Absent-None; Abstained-None.

## REPORT FROM THE REAL ESTATE ADVISORY COMMITTEE REGARDING ALLOWING EQUITY SHARE UNITS ON PORT TIDELANDS, AND DIRECTION TO STAFF

Agenda Item 29.  Dan Wilkens, Executive Vice President, addressed the Board and gave a brief overview of the item. Commissioner Valderrama, as Chair of the Real Estate Advisory Committee, presented the Committee's recommendation regarding allowing timeshares on District property.  (A copy of the Real Estate Advisory Committee report is on file in the Office of the District Clerk.)

The following individuals addressed the Board regarding this matter:  Steven Kaufmann, representing Woodfin Suite Hotels; Sam Hardage, representing Woofdin Suite Hotels; and George Palermo, representing 5th Avenue Landing and Spinnaker Hotel.

Commissioner discussion ensued.  Chairman Spane stated that he did not support the recommendation as it is in opposition to the Public Trust Doctrine, and requested a motion to table the issue.  Commissioner Hall expressed support of the recommendation, and stated that the use of timeshares/equity share occupancies would actually enhance public access to tidelands and the Bay, and would ensure consistent

**EXHIBIT 14**

**AGENDA ITEM 29**

## SAN DIEGO UNIFIED PORT DISTRICT

**DATE:**      September 5, 2006

**SUBJECT:   CONDUCT PUBLIC HEARING AND ADOPT ORDINANCE AMENDING UPD CODE §4.36 AND AN UPDATE ON ADDITIONAL MOORINGS IN SAN DIEGO BAY**

### EXECUTIVE SUMMARY:

On June 6, 2006 the Board of Port Commissioners directed staff to return in 90 days with proposed amendments to UPD Code §4.36 to address issues of increased crime, environmental concerns, abandoned and derelict vessels, and cost to the District associated with the A-8 Anchorage. Staff is requesting that the Board adopt the proposed amendments to UPD Code §4.36 – A-8 Anchorage ordinance.

Staff continues to work on developing alternative sites for additional mooring buoys in the bay in order to provide mooring for those A-8 Anchorage permit holders who desire a mooring buoy once the A-8 Anchorage is closed. Public outreach was conducted to gather input for locations. Staff will return to the Board in the coming months to propose final recommendations as to placement of additional moorings in San Diego Bay, the anticipated timeline and associated costs.

### RECOMMENDATION:

Conduct public hearing and adopt the proposed amendments to UPD Code §4.36 – A-8 Anchorage.

### FISCAL IMPACT:

The Board's adoption of the proposed amendments to UPD Code §4.36 - A-8 Anchorage has no fiscal impact.

### DISCUSSION: PROPOSED AMENDMENTS TO UPD CODE §4.36

At the Board meeting on June 6, 2006 staff obtained direction from the Board to return in 90 days with proposed amendments to UPD Code §4.36.    Thereafter, staff commenced public outreach and awareness meetings to gather public input regarding the proposed changes to the A-8 Anchorage ordinance and to discuss the feasibility of the possible alternate mooring buoy locations which staff has identified and is currently researching.

Staff held two public outreach meetings regarding the proposed changes to UPD Code 4.36 - A-8 Anchorage ordinance. A representative from Katz & Associates facilitated all of the meetings. All comments and answers to corresponding questions asked at sessions are available at the Clerk's Office.

ACTION TAKEN:  09/05/06 - Ordinance 2413

**AGENDA ITEM 29**

**Proposed Amendments To UPD Code 4.36**

A draft of the proposed amendments to UPD Code §4.36 is attached and the following is a summary of the proposed changes:

- The definition of "seaworthy" has been strengthened but is still less stringent than the federal standard.
- In order to obtain an anchoring permit, the permittee must include the names of all persons who will be using, possessing, or controlling the vessel.
- All permittees must use pumpout facilities regularly, or otherwise discharge human waste legally.
- All permittees shall maintain a log relative to use of pumpout facilities, and provide the log to Harbor Police personnel at all reasonable hours and upon request.
- Proof of inspection by the United States Coast Guard Auxiliary Courtesy Marine Examination shall be accepted in lieu of an inspection by Harbor Police personnel.
- All permittees shall provide a $2,500 refundable deposit, forfeited should the vessel become abandoned, derelict, or incur charges as a result of impound, towing, storage or destruction by the District.
- Permittees are limited to one vessel per applicant.
- Upon enactment of Section 4.36 the District shall discontinue issuing new anchoring permits in the A-8 Anchorage and the District may relocate vessels within the A-8 Anchorage for the purpose of reconfiguring the anchorage or eliminating it.
- The definition of "Marine Sanitation Device" (MSD) comports with the Harbors and Navigation Code.
- Grounds to refuse to issue or revoke an anchoring permit have been expanded to include failure of a permittee to comply with any federal, state or local law, or to pay any outstanding fees or charges owed to the District for damage to District property, towing and storage of a vessel, abandoning a vessel, or failing to remove any derelict, beached, sunken or partially sunken vessel.
- As a part of the vessel inspection process, a dye table may be placed into the vessel's MSD to ensure that it is in working condition and complies with federal regulations pertaining to MSD's.
- All construction materials, refuse, spare parts, surplus equipment or any other such material not needed for the direct operation of the vessel or to accommodate shall be stored in an enclosed space.

If approved by the Board, the proposed amendments will be effective and enforceable on October 6, 2006.

## AGENDA ITEM 29

### MOORING UPDATE

In response to the Board's direction to provide an update on the identified and researched mooring alternatives, staff began public outreach and an awareness process to garner public input and to discuss the feasibility of the possible alternate mooring buoy locations.

Three public outreach sessions were conducted: July 21, July 27 and August 2, in Coronado, San Diego and National City, respectively, to obtain input from the community on mooring buoys locations. Comments and answers to questions posed at the sessions are available from the Clerk's Office. Many of the public were in favor of additional mooring buoys.   There were also many opposed, including the City of Coronado, which passed a resolution opposing the early recommendation to add mooring buoys to the existing A-4 Anchorage.

Currently, three locations have been identified to add moorings.   All three are in established mooring fields. Staff will continue to investigate and work to finalize a location/s, number of buoys to install and the costs associated with the installation. Staff is currently surveying current A-8 permittees to determine the level of interest in a buoy based on ability to meet the requirements for a mooring buoy which will assist in determining the final number needed. From there, staff can estimate total costs for the installation and final location. Once completed, staff will continue negotiations with San Diego Mooring Company for lease changes. Also, staff will complete its investigation and cost estimate for environmental clean up of the current A-8 Anchorage area; however, any clean up cannot commence until after the A-8 Anchorage has been vacated. Finally, re-evaluation of the number of buoys required can continue based on levels of interest and need by the boating community.

### Staff Recommendation

Adopt the proposed amendments to UPD Code §4.36 – A-8 Anchorage ordinance.

### Port Attorney's Comments:

The Port Attorney's office has extensively reviewed the proposed amendments for form and legality.  The Port Attorney's office submitted a copy of the draft amendments to the Department of Boating and Waterways (DBW) for its review and comment, pursuant to Harbors and Navigation Code §660. The Port Attorney's office also reviewed all of the public comments obtained during the public outreach meetings to identify any potential legal issues.

Counsel for the DBW has opined that an insurance requirement is not feasible nor would it be enforceable.  Based upon the holdings of two California Attorney General opinions, because the area of insurance is preempted by the State and the District is not a charter city, an insurance requirement is generally viewed as overly burdensome

to navigation as the A-8 Anchorage is an anchorage, not a marina or mooring field. Further, counsel for DBW did not believe that allowing insurance in lieu of the $2500 deposit would be permissible because it would still provide an advantage to those with insurance at the expense of those without insurance. Finally, the Port Attorney's office provided a copy of the proposed Code changes to the State Lands Commission, which provided positive feedback.

**Environmental Review:**

N/A

**Equal Opportunity Program:**

The proposed amendments to UPD Code §4.36 will apply to and be binding upon all A-8 Anchorage Disabled permittees currently located in the A-9 Anchorage.

**PREPARED BY**: Kimberly Fives
                        Captain - Harbor Police

SEC. 4.36 - REGULATION OF VESSELS - A-8 ANCHORAGE

(a) <u>Purpose</u>

California law (San Diego Unified Port District Act, Harbors and Navigation Code, Appendix 1) requires the Board of Port Commissioners to regulate and control the anchoring, mooring, towing and docking of vessels, and to make and enforce all necessary rules and regulations governing the use and control of navigable waters within the District. The purpose of this Section of the San Diego Unified Port District Code is to implement that responsibility within the A-8 Anchorage.

(b) <u>Definitions</u>

Certain words and phrases used herein are defined as follows, unless the context requires a different meaning:

1. <u>A-8 Anchorage</u> - In Center San Diego Bay, the Sweetwater Anchorage, the water enclosed by a line beginning at latitude 32°39'12.2" N., longitude 117°07'45.1" W.; thence easterly to latitude 32°39'12.2" N., longitude 117°07'30.1" W.; thence southerly to latitude 32°38'45.2" N., longitude 117°07'30.1" W.; thence westerly to latitude 32°38'45.2' N., longitude 117°07'45.1" W.; thence northerly to the point of beginning.

2. <u>Abandonment</u> - Any hulk, derelict, wreck or parts of any ship, Vessel, or other watercraft, sunk, beached or

SEC. 4.36 (cont.)

allowed to remain in an unseaworthy or dilapidated condition

upon publicly owned submerged lands, salt marsh, or tidelands

for a period longer than Thirty (30) days without a watchman

or other person being maintained upon or near and in charge

of the property, as defined in Section 522 of the Harbors and

Navigation Code.

3.    Anchorage - Any portion of the A-8 Anchorage

which has been designated by competent authority for the

anchoring of Vessels.

4.    Anchoring - Attachment of a Vessel or structure

to the bottom or the shore of San Diego Bay using an anchor

and proper ground tackle or by any other means.

5.    Anchoring Permit - A document conferring the

right to use an anchor in the A-8 Anchorage for a prescribed

period.

6.    Applicant - Individual applying for an Anchoring

Permit to anchor in the A-8 Anchorage.

7.    Caretaker - Has the same meaning as watchman

and is an individual who has been designated by a boat owner,

in writing, to act in the owner's absence; Caretaker information

shall be contained in the Anchoring Permit Application file.

SEC. 4.36 (cont.)

8.    <u>District</u> - The San Diego Unified Port District.

9.    <u>Executive Director</u> - Executive Director of the San Diego Unified Port District.

10.    <u>Harmful Substances</u> - Solid or liquid or gaseous material which may cause harm to or pollute the inland waters.

11.    <u>Hearing Officer</u> - Person designated by the Executive Director to hear testimony and receive evidence regarding an Anchoring Permit refusal or revocation.

12.    <u>High Seas</u> - Those waters outside of San Diego Bay beyond an imaginary line between Zuniga Jetty Light "Z" and the Point Loma Light.

13.    <u>Major Repair</u> - Includes without limitation the use of welding or burning equipment, spray painting on the exterior of a Vessel, exterior sandblasting and any work beyond repair or replacement of electrical equipment, mechanical or hydraulic components or repair and adjustment to machinery which remains onboard the Vessel.

14.    <u>Marine Sanitation Device</u> - Any equipment on board a Vessel which is designed to receive, retain, treat, or discharge sewage, and any process to treat the sewage.

SEC. 4.36 (cont.)

15.    Permittee - person who has acquired an Anchoring Permit from the District to anchor in the A-8 Anchorage.

16.    Propulsion System - A system which is designed to propel a Vessel through the water through the use of sail or mechanical power.

17.    Seaworthy - Describes a Vessel in good material condition which is not likely to sink or become a menace to navigation or a nuisance, and which is capable of getting underway and navigating upon the High Seas.

18.    Sewage - Human body waste, either treated or untreated.

19.    Vessel - A watercraft designed to float upon the surface of a body of water for the purpose of transporting persons or property.

20.    Waste - Sewage and all other waste or substances associated with human habitation; or of human or animal waste.

(c)    Anchoring Permits

1.    No person (including the owner, master, operator, caretaker or person in possession of a Vessel) shall anchor a Vessel in the A-8 Anchorage without first having

SEC. 4.36 (cont.)

secured an Anchoring Permit from the District in the form and manner provided therefor.

2.      For an Anchoring Permit to be issued, the following must be satisfied:   verification of ownership, verification of registration; names of all persons using, possessing or controlling the Vessel; an inspection confirming its seaworthiness, Marine Sanitation Device, waste containers, safety and fire suppression equipment and other safety and health-related equipment as required by existing laws.

3.      Vessels must have a propulsion system and operate under their own power to the District approved inspection site.

4.      The Vessel's bilges must be petroleum free.

5.      The Anchoring Permit will be valid for Six (6) Months from the date of issue. Re-inspection of the Vessel will be required upon renewal of the Anchoring Permit and the Vessel inspection will be at a site determined by District.

6.      Permittees and other persons using, possessing or controlling the Vessel as named in the Permit shall use pumpout facilities on a regular basis or otherwise discharge human waste in a legal manner.

SEC. 4.36 (cont.)

      7.     Each Permittee shall maintain a log relative to the use of pumpout facilities. The log shall contain the date, time and location waste was discharged. The discharge log shall be available for inspection by Harbor Police personnel at all reasonable hours and upon request. The log shall be submitted to Harbor Police in conjunction with any application for renewal of a Permit.

      8.     The District shall accept proof of successful completion of a United States Coast Guard Auxiliary Courtesy Marine Examination as evidence of fulfilling the requirements as set forth in Section 2 through 4, above.

      9.     The Applicant shall provide a security deposit in the amount of Two Thousand Five Hundred Dollars ($2,500.00). All or part of the security deposit shall be forfeited to the District for any expense incurred as a result of damage to District property or for towing and storage related services. The security deposit will otherwise be refunded upon the expiration or revocation of a permit and the Vessel has been removed from the anchorage.

      10.    Anchoring permits will be limited to One (1) Vessel per Applicant. Any owner having more than One (1) permitted Vessel in the Anchorage, prior to the enactment of

**EXHIBIT 15**



September 5, 2006                                                    page 250

Agenda Item 28c.    On motion of Commissioner Valderrama, seconded by Commissioner Cushman, the Board adopted RESOLUTION 2006-144 finding that "The Wharf" by Point Loma Marina, LLC, a California limited liability company, are parties to an Option to Lease Agreement (Option) dated 8 March 2005, as amended, covering approximately 75,650 square feet of land area and approximately 163,285 square feet of water area located at 4960 North Harbor Drive in the City of San Diego, said Option, as amended, and the proposed lease attached thereto, is on file in the office of the District Clerk as Document No. 48530. The Project, in general, consists of developing Two (2) commercial buildings with Building A being a two-story structure approximately 8,262 gross enclosed square feet, and Building B being a two-story structure of approximately 10,240 square feet for restaurant, food court, retail, marine-related offices, and marina support facilities; a marina of up to Fifty (50) slips; a public park no less than One Hundred (100) feet in width and a minimum of 16,000 square feet; pubic shoreline and perpendicular to the shoreline (in the Park) access promenades; overhead structure creating an open breezeway of approximately 3,600 square feet; a public pedestrian pier of approximately 1,500 square feet; recreational dock and dine facilities; paved vehicular parking lots with no less than One Hundred Seven (107) on-site spaces; repairs and/or upgrades to the shoreline revetment, and demolition of the existing improvements with the exception and addition of the operation and maintenance of the existing on-site water taxi dock; said Project is located in Planning District 1 of the District Master Plan, the Precise Plan for which provides for uses as follows: "Commercial - Commercial Recreation/Recreational Boat Berthing"; proposed use for the Project is consistent with the use and development concept for the Shelter Island area as provided in said District Master Plan and, as such, is an Appealable Development which conforms to the certified District Master Plan on file in the office of the District Clerk as Document No. 44566; more fully described in RESOLUTION 2006-144, was adopted by the following vote: Yeas-Bixier, Cushman, Rios, Spane; Valderrama; Vilaplana Nays-None; Excused-None; Absent-None; Abstained-None.

## ORDINANCE AMENDING OF THE SAN DIEGO UNIFIED PORT DISTRICT CODE §4.36 AND UPDATE ON ADDITIONAL MOORINGS IN SAN DIEGO BAY

Agenda Item 29.    Kimberly Fives, Captain, Harbor Police, addressed the Board regarding the amendments to UPD CODE §4.36. She acknowledged the District staff for their work. (A copy of the presentation is on file in the office of the District Clerk.)

Captain Fives introduced Ellen Gross Miles, Deputy Port Attorney, who reviewed the letter received on Friday, September 1, 2006, from the David Johnson, Director of

the Department of Boating and Waterways. Ms. Miles stated she sent a letter responding to Director Johnson's concerns and citing the District's regulatory power from the State to make the proposed changes.

Captain Fives updated the Board on the long-term plan to add mooring buoys. She stated three public outreach sessions were held and staff continues to study the sites and a staff recommendation would be premature prior to thorough analysis.

Commissioner Spane opened the public hearing. Joyce Graff addressed the Board. Commissioner Spane requested staff address two of Ms. Graff's concerns. Ms. Miles clarified the issue of uniformity, specifically the $2500 deposit, which was recommended due to the unique nature of the A-8 Anchorage, including: prolonged vessel storage; being subject to the high winds and fetch with no mooring buoy field and large amount of debris and pollutant from the area. Commissioner Spane then requested clarity, and Ms. Miles responded the anchorage is not uniform. Charlie Ellery then addressed the Board requesting clarification of staff's recommendation of requiring a deposit. Ms. Miles responded to Mr. Ellery's concerns. As there were no additional public comments, Chairman Spane closed the public hearing.

Commissioner discussion ensued. Chairman Spane requested and received clarification regarding contractual expenses to support the South Bay Boat Yard. Commissioner Rios requested and received verification regarding the $2500 deposit recommendation with no additional insurance requirements.

Commissioner Bixler requested and received clarification regarding the following matters: the tender vessel relative to the anchored vessel; amendments to the anchorage permitting process; that no interest will be accrued or paid when the deposit is returned; sufficiency of ground tackle; and the use of welding or burning for repairs. Commissioner Bixler requested staff consider the deposit amount be scaled based on vessel size related to towing and disposal expenses. Ms. Miles clarified the decision-making process, explaining the data analysis used in the recommendation.

Commissioner Vilaplana stated his concerns regarding the ordinance's language specifically relating to prohibiting the dumping of oil, spirits, harmful substances and other pollutants the A-8 Anchorage and suggested the need for language uniformity in the District Code. Chairman Spane suggested due to the concerns of the Department of Boating and Waterways to continue the matter for an additional thirty days. Commissioner Cushman addressed Commissioner Vilaplana's concerns and urged passing the ordinance as the first step toward addressing environmental concerns. Commissioner Rios stated her agreement with Commissioner Cushman's view

supporting the ordinance. Commissioner Vilaplana expressed his concern that the Code, if implemented District wide, could not withstand legal challenges. Duane Bennett, Port Attorney, stated that the Port Attorney's office felt the ordinance enactments were defensible.

Chairman Spane reiterated continuing the matter for an additional thirty days to write a better ordinance and to address the concerns of the Department of Boating and Waterways. He further stated that as staff reviews the long-term recommendations for additional buoys, the A-8 Anchorage associated costs could be used as a budget bench mark, and that when planning for additional mooring buoys to be located south of the Coronado Bay Bridge, staff should first engage the Navy regarding potential security requirements. Chairman Spane then formally closed the public hearing and requested motions on the agenda item.

Commissioner Valderrama made a motion to approve staff's recommendation for amendments to UPD CODE §4.36. Commissioner Rios seconded the motion.

On motion of Commissioner Valderrama, seconded by Commissioner Rios, the Board adopted ORDINANCE 2413, amending Article 4 of the San Diego Unified Port District Code by amending Section 4.36, Regulations of Vessels – A-8 Anchorage, to read as more particularly outlined in Ordinance 2413, by the following vote: Yeas-Bixler, Cushman, Rios, Valderrama, Nays-Spane, Vilaplana; Excused-None; Absent-None; Abstained-None.

## ORDINANCE AMENDING PORT OF SAN DIEGO TARIFF NO. 1-G RATES AND CHARGES; NON CARGO RELATED ITEMS.

Agenda Item 30. Chairman Spane announced that this item would be continued to a future board meeting.

## ACTION AGENDA

## ORDINANCE AMENDING MEMORANDUM OF UNDERSTANDING BETWEEN THE SAN DIEGO UNIFIED PORT DISTRICT AND THE CITY OF IMPERIAL BEACH

Agenda Item 31. Commissioner Bixler requested that if there were no public comments the item be approved with no further discussion, however, Commissioner discussion ensued.