1

John Gallagher
2  P.O. Box 712473
Santee, CA 92072
3  Telephone: (619) 379-8279

FILED

08 SEP -2 PM 12:39

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**
10
**SOUTHERN DISTRICT OF CALIFORNIA**
11

12

13  JOHN GALLAGHER

Case No.  08-cv-0886 IEG (RBB)

14                            Plaintiff

**PLAINTIFF'S REQUEST FOR
JUDICIAL NOTICE**
15

16              vs.

**Date: 9-15-08
Time: 10:30 a.m.
Dept: Judge Gonzalez**
17

18  SAN DIEGO UNIFIED PORT DISTRICT, CITY

19  OF CORONADO et al., DOES 1 THROUGH 20

20                            Defendant

21

22                            I

23  **TO: DEFENDANT AND THEIR ATTORNEY OF RECORD:**

24      Please take notice that plaintiff request the Court to take

25  judicial notice of that certain "Opposition to Motion to Enforce

26  Judgment" filed by port authority counsel in prior Southern

27  District case entitled "Gallagher v. San Diego Unified Port

28  District", Case no. 98-cv-0615-J(JAH). The request is made

-1-

pursuant to Federal Rules of Evidence 201, and the memorandum is attached hereto as exhibit A.

**Date: 09-02-08**

Respectfully Submitted,

JOHN GALLAGHER

**In Pro Se**

-2-

**EXHIBIT A**

1  SAN DIEGO UNIFIED PORT DISTRICT
   DAVID R. CHAPMAN, ESQ. (SBN 74247)
2  PORT ATTORNEY
   ELLEN FAYE MILES, ESQ.(149127)
3  DEPUTY PORT ATTORNEY
   P.O. Box 120488
4  San Diego, CA 92112-0488
   Phone:       (619) 686-6219
5  Fax:         (619) 686-6444

6  Attorneys for Defendant
   SAN DIEGO UNIFIED PORT DISTRICT

7

8

              IN THE UNITED STATES DISTRICT COURT
9
              FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10

11

12  JOHN GALLAGHER,                       )    Case No.:   98 CV 0615 J(JAH)
                                          )
                    Plaintiff,            )    OPPOSITION TO MOTION TO ENFORCE
13                                        )    JUDGMENT
    Vs.                                   )
14                                        )    Date: December 16, 2002
    SAN DIEGO UNIFIED PORT DISTRICT,      )    Time: 10:30 AM
15  and DOES 1 through 20, inclusive      )    Courtroom: 12
                                          )    Judge:  HON. NAPOLEON A. JONES
16                  Defendants.           )
                                          )
17

18

19

20

21

22

23

24

25

26

27

28



## INTRODUCTION

1      This case involves the SAN DIEGO UNIFIED PORT DISTRICT ("DISTRICT")'s on going

2  efforts to reasonably accommodate plaintiff John GALLAGHER ("GALLAGHER") in order that he

3  may anchor, free and long-term, in San Diego Bay.

4      The issue presented by GALLAGHER's motion to enforce the judgment is whether the A-9

5  Anchorage, where he has been permitted to anchor for free and for long-term, is a reasonable

6  accommodation. The issue is not GALLAGHER's desire to anchor in Glorietta Bay, which he has

7  wanted ever since he was required to leave there by the DISTRICT in 1996. It will be plain to the

8  court from the evidence presented by the DISTRICT that it fully complied with the Third Offer of

9  Judgment ("Offer") (plaintiff's Exhibit "A"), and that therefore, there is nothing for the court to

10  enforce.

11      GALLAGHER has never attempted to use the A-9 Anchorage. Instead, he has asserted

12  specious claims as to why he cannot use the anchorage which change over time when he

13  realizes one claim does not pass muster. GALLAGHER argues that the only reasonable

14  accommodation for him is to allow him to anchor for free, long-term, in Glorietta Bay, in the City of

15  Coronado.

16      The goal of Title II of the Americans with Disabilities Act (ADA) is to provide <u>equal access</u>

17  to public places and facilities to persons with disabilities. It is not to give one individual public

18  benefits not enjoyed by anyone else. It is also not to result in an accommodation that constitutes

19  a fundamental alteration of a service or activity offered by the DISTRICT --short-term, 72 hour

20  limit, recreational anchoring in Glorietta Bay.  In this brief, the DISTRICT will present evidence

21  and argument clearly showing that 1) the DISTRICT fully complied with the terms of its Offer,

22  thereby rendering GALLAGHER's motion to enforce the judgment an improper remedy for the

23  wrongs that GALLAGHER now complains of; 2) that use of the A-9 Anchorage by GALLAGHER

24  constitutes a reasonable accommodation under Title II of the ADA; and, 3) that GALLAGHER's

25  request to anchor for free, long-term, in Glorietta Bay, if entertained by the court, would constitute

26  an unreasonable accommodation in that it would fundamentally alter the present use of Glorietta

27  Bay by visiting mariners and the community as a short-term, recreational anchorage.

## STATEMENT OF FACTS

1

2    The DISTRICT has designated the A-8 Anchorage, located in the Central and South San

3    Diego portions of the San Diego Bay, as a free, long-term anchorage for individuals. The only

4    requirement is that a permit be obtained, which is issued free of charge and upon the successful

5    completion of a vessel inspection for seaworthiness and sanitation.    GALLAGHER's "anchoring

6    claim"[1] alleged that he was being discriminated against by the DISTRICT in violation of Title II of

7    the ADA because he could not use the A-8 Anchorage due to his disability.  GALLAGHER never

8    claimed in prior proceedings that his alleged "eviction" from Glorietta Bay several years ago

9    (plaintiff's motion, 2:16-24) was a violation of the ADA; rather, he claimed that due to his disability

10   he could not use the A-8 Anchorage.  He alleged, among other things, that the A-8 Anchorage did

11   not have a wheelchair accessible dock[2]; that the A-8 Anchorage was subject to adverse weather

12   and wave conditions; and, that he had to row out a great distance in a dinghy from Pepper Park in

13   National City to get to the anchorage.

14   After significant litigation, the DISTRICT tendered the Offer (Exhibit "A" to plaintiff's

15   motion), which was accepted by plaintiff.  That Offer established the A-9 Anchorage (also known

16   as the "cruiser's anchorage") as a disabled anchorage.  This Offer was made by the DISTRICT

17   after examining all of the anchorages in the bay, their uses, popularity, and function.  The Offer

18   also stated that should the A-9 Anchorage not constitute a reasonable accommodation for a

19   person with a disability that the parties would engage in an interactive process to determine

20   whether the DISTRICT could make a reasonable accommodation, "taking into account all factors

21   including, without limitation, whether the request constitutes a reasonable accommodation or a

22   fundamental alteration in the Port DISTRICT's service, program, or activity..[t]he financial impact

23   of any proposed accommodation shall also be assessed" (Exhibit "A" to plaintiff's motion, 3:9-16.)

24

25

[1] This claim is called the "anchoring claim" to distinguish it from another lawsuit filed by GALLAGHER which
26   alleged violations of the ADA with respect to DISTRICT facilities; i.e., docks, restrooms, etc.  That portion of the
lawsuit was settled in May, 2000, wherein the DISTRICT is still making improvements pursuant to that
27   settlement agreement, one of which is the very dinghy dock of which GALLAGHER complains (Declaration of
Javier Saunders, filed and served herewith; Exhibit "1").
28   [2] GALLAGHER claims that he uses a wheelchair "from time to time." However, GALLAGHER has also been
seen by DISTRICT personnel riding a bicycle, walking, and driving an automobile, which is not wheelchair-
adapted.

1    On or about April, 15, 2001, GALLAGHER wrote a letter to the DISTRICT's Executive

2  Director claiming he could not use that A-9 Anchorage and requesting a reasonable

3  accommodation. William Chopyk, Manager, Planning Services/ADA Coordinator, on behalf of the

4  Executive Director, contacted GALLAGHER by telephone concerning his letter on May 4, 2001.

5  He received no response from GALLAGHER, and finally wrote GALLAGHER a letter on May 15,

6  2001, formally offering GALLAGHER an interactive meeting. He was unable to schedule an

7  interactive meeting with GALLAGHER until June 5, 2001 (declaration of William Chopyk

8  ("Chopyk"), ¶8; Exhibit "2").

9    On June 5, 2001, Mr. Chopyk met with GALLAGHER along with other DISTRICT staff.

10  GALLAGHER reiterated his desire to anchor in Glorietta Bay, but stated that should the A-9

11  Anchorage be remodeled with a wheelchair accessible dock, that he would consider anchoring

12  there, except in the case of big waves. GALLAGHER stated in the meeting that he was

13  concerned about the lack of a wheelchair accessible dock, due to his occasional use of a

14  wheelchair (declaration of Chopyk, ¶9 ; Exhibit "3"). It should be noted that discussion of

15  installing a "break" at the A-9 Anchorage was never discussed; it would be prohibitively expensive

16  and would fundamentally alter the bay (declaration of Chopyk, ¶10).

17    After that, GALLAGHER met on at least two other occasions with Lt. Ken Franke, San

18  Diego Harbor Police Department, to discuss ways that GALLAGHER could best utilize the A-9

19  Anchorage. Lt. Franke on all occasions, offered to personally escort GALLAGHER by boat to that

20  area of the A-9 Anchorage which was the calmest and offered the most protection (declaration of

21  Franke ¶¶16-17). GALLAGHER ignored these offers (declaration of Franke, ¶17).

22    The DISTRICT had no contact with GALLAGHER for several months. Correspondence

23  then ensued between the DISTRICT and GALLAGHER (declaration of Gross, ¶3; Exhibit "4";

24  Exhibit "5"; Exhibit "6" concerning, in essence, the "reasonableness" of the DISTRICT's

25  accommodation of GALLAGHER. The DISTRICT maintained in its correspondence with

26  GALLAGHER, via his counsel, with a considerable factual basis, that the A-9 Anchorage is, and

27  continues to be, a reasonable accommodation for GALLAGHER and his disability. On November

28  1, 2002, the DISTRICT received GALLAGHER's motion.

1    Apparently unnoticed by GALLAGHER or his counsel is that the A-9 Anchorage dinghy

2  dock has been completely rebuilt to comply with the ADA.  Additional information concerning the

3  new dinghy dock is contained in the declaration of Javier Saunders, Assistant Director,

4  Engineering-Design, which is filed and served herewith and incorporated by this reference; see

5  also, Exhibit "7" [photograph of new dinghy dock taken by Lt. Ken Franke].

6                        **POINTS AND AUTHORITIES**

7                          **AND ARGUMENT**

8                                I.

9           **THE DISTRICT COMPLIED WITH THE TERMS OF ITS OFFER**

10   GALLAGHER invokes the jurisdiction of the court to "enforce" this judgment, which was

11  based upon the DISTRICT's Offer.  However, there is nothing to enforce, as the DISTRICT has

12  complied with all of the terms of its Offer.

13   In this case, the Offer specifically stated that as a reasonable accommodation

14  GALLAGHER would be permitted to anchor for free and long-term in the A-9 Anchorage.

15  GALLAGHER received a permit for the A-9 Anchorage on August 22, 2001 (Exhibit "8").  The

16  permit does not expire, subject to an annual inspection for seaworthiness and sanitation which is

17  required of permittees in the A-8 Anchorage[3].  The Offer further states that if GALLAGHER

18  believed that the A-9 Anchorage did not constitute a reasonable accommodation, that the

19  DISTRICT would engage in an interactive process with him (plaintiff's Exhibit "A").  Second, the

20  terms of the Offer stated that should the A-9 Anchorage not constitute a reasonable

21  accommodation, then the DISTRICT would engaged in the interactive process with GALLAGHER

22  after he claimed that the anchoring in the A-9 Anchorage did not constitute a reasonable

23  accommodation (plaintiff's Exhibit "A", 3:7-18).  The DISTRICT fulfilled this portion of the Offer.  In

24  essence, GALLAGHER is asking the court to award him remedies which are obviously outside

25  the scope of remedies available to a plaintiff seeking relief under a motion brought pursuant to the

26  rule.

27  _____

28  [3] Because the A-8 Anchorage is the only free, long-term anchorage in San Diego Bay, and the A-9 Anchorage basically
     replaces that anchorage for persons with disabilities, the vessels still must pass the seathworthiness and sanitation criteria

1    There is no dispute that the DISTRICT permitted GALLAGHER a free, long-term

2    anchorage in the A-9 Anchorage (Exhibit "8"). It is equally undisputed that GALLAGHER has not

3    availed himself of this accommodation (declaration of Franke, ¶17). There is no dispute that the

4    parties engaged in an interactive process (see, e.g., Barnett v. U.S. Airways, 228 F.3d 1105,

5    1112-1113 (9th Cir., 2000), vacated on other grounds, U.S. Airways v. Barnett, 535 U.S., 391

6    (2002). GALLAGHER is merely protesting the outcome. This is evidenced by GALLAGHER's

7    own declaration, which states at pertinent part that: "I felt compelled to accept the Offer because

8    it was unlikely that I would recover greater relief if the matter went to trial.." (GALLAGHER

9    declaration, ¶6). That is because he knows that anchoring in Glorietta Bay is not a reasonable

10   accommodation, and that the trier of fact would hold so. There is nothing in the Offer, or in the

11   judgment in this case, that provides what GALLAGHER is requesting: namely, a trial on the

12   merits of his underlying action. GALLAGHER's remedy in this action is to commence litigation; a

13   motion to enforce the judgment is clearly inappropriate because the DISTRICT has complied with

14   its every aspect.

15                                          II.

16                    THE DISTRICT PROVIDED GALLAGHER WITH
                            A REASONABLE ACCOMODATION
17

18        GALLAGHER's first fault with the A-9 Anchorage, that it does not have an accessible

19   dinghy dock, is moot (declaration of Saunders, filed and served herewith; Exhibit "7 ").

20        GALLAGHER's claims that the A-9 Anchorage has severe wind and sea conditions is

21   simply not supported by the evidence, especially in light of the fact that GALLAGHER has never

22   attempted to even use the A-9 Anchorage. Based upon the declaration of Lt. Ken Franke, filed

23   and served herewith, who's training and experience in navigation, seamanship, and on the San

24   Diego bay are substantial, both the A-9 Anchorage and Glorietta Bay are far superior to that of

25   the A-8 Anchorage. The wind conditions at the A-9 Anchorage and the Glorietta Bay Anchorage

26   are usually the same in the afternoon (when the wind, if any picks up), with a NW 10 knot breeze

27

28

established for long-term anchoring set forth in the A-8 Anchorage ordinance. GALLAGHER has not challenged these
criteria.

1 (declaration of Franke, ¶8). Photographs of the A-9 Anchorage and Glorietta Bay taken by Franke

2 on November 8, 2002, during a storm, show the conditions of each anchorage to be the same

3 (Exhibit "9"[A-9 Anchorage];Exhibit "10" [Glorietta Bay]), (dec. of Franke, ¶ 8).

4       First, GALLAGHER has stated that he cannot row his dinghy for more "than about 150

5 yards" before he becomes too fatigued to continue (GALLAGHER declaration, 2:9-12). If this is

6 the case, then GALLAGHER could not use the A-9 Anchorage OR the Glorietta Bay Anchorage.

7 Using Nobeltec software (navigation software), which measures distances in San Diego Bay, Lt.

8 Franke measured the distance from the A-9 Anchorage dinghy dock to be approximately 515

9 yards to the closest point of the anchorage, while the A-8 Anchorage distance from dock to

10 anchorage is approximately 1200 yards, and the distance from the dinghy dock to the Glorietta

11 Bay Anchorage to be approximately 270 yards (declaration of Franke, ¶7). At least if

12 GALLAGHER has to rest while rowing, at the A-9 Anchorage he would be rowing along the shore,

13 and right next to the USCG station.

14       Additionally, GALLAGHER's claim of excessive channel traffic in the A-9 Anchorage is

15 also without merit. As Lt. Franke points out, Glorietta Bay is also subject to channel traffic to a

16 certain extent greater than that of the A-9 Anchorage, because it is a navigation channel, where

17 vessels come and go frequently. It should also be noted that the navigation channel in Glorietta

18 Bay is also used by military vessels from the nearby Navy facility (declaration of Franke, ¶9).

19 Given tightened security on the bay in the aftermath of the terrorist attacks, such traffic can only

20 get worse.

21       Moreover, GALLAGHER's dire explanation of the swells and the chop in the A-9

22 Anchorage are completely without foundation. As explained by Lt. Franke (declaration of Franke,

23 ¶11-12), swells are relatively long wind waves, which then becomes a wave. These do not exist

24 in the A-9 Anchorage. Chop is waves created by a generating area, which culminates in short,

25 sometimes unstable sea patterns, and during winter storms. Exhibit "9" is generally what the A-9

26 Anchorage looks like during a storm.

27       GALLAGHER fails to inform the court that Glorietta Bay does not have an accessible

28 dinghy dock (Exhibit "11"). Additionally, Exhibit "12" and Exhibit "13", showing each side of the

1  dinghy dock, clearly show that the only access to Glorietta Bay is by the dinghy dock or the boat

2  launching ramp.

3         GALLAGHER also claims that he needs a boat launching ramp to allow him to take his

4  dinghy out of the water on a daily basis.  This is a recently new argument.  The reason

5  GALLAGHER makes this transparent, unsupported claim, is because while the A-8 Anchorage

6  and Glorietta Bay each have a boat launching ramp, the A-9 Anchorage does not.  It thus follows,

7  under GALLAGHER's distorted logic, that the A-9 cannot constitute a reasonable accommodation

8  for him.

9         GALLAGHER also alleges (in his motion, not in his declaration) that he needs an adjacent

10  boat launching ramp which would allow him to take his dinghy out of the water on a daily basis.

11  Dinghies are used by boaters, like GALLAGHER, who do not have a slip for their vessels.  The

12  purpose of the dinghy is to provide transportation from the dock to the boat.  The dinghy then

13  stays next to the vessel.  When the boat owner goes ashore, he or she leaves the dinghy at the

14  dinghy dock, tied up and secured (declaration of Franke, ¶  ).  Dinghies are not removed from the

15  bay on a daily basis,  Removing any dinghy, whether rubber or wood, from the water would

16  require a significant amount of stamina (declaration of Franke, ¶  ).

17         Although the A-8 Anchorage and the Glorietta Bay Anchorages do have boat launching

18  ramps, they are not intended for or designed to accommodate dinghies. They are intended to

19  accommodate trailerable vessels.  They are used by vehicles with vessel trailers which back into

20  the bay, using the boat launching ramp, and when the trailer is deep enough in the water, the

21  vessel is freed from the trailer (declaration of Franke, ¶  ).  The concrete surface has deep

22  grooves which is designed for vehicles backing their vessel trailers with their boats aboard  to

23  launch them into the water (Exhibit "14").  Dinghies are not launched into the water via a boat

24  launching ramp – they are carried down the dock and deposited into the water.  The surface

25  would also not be amenable to having a dinghy bottom dragged down it:if inflatable, it would rip; if

26  wooden, the bottom would not be flat.  Finally, from a public safety perspective, it would be

27  unreasonable to attempt to launch a dinghy from a boat launching ramp where vehicles with

28  trailers are backing up into the water, unable to see what is below them.

OPPOSITION TO MOTION TO ENFORCE JUDGMENT

1    Finally, there is no parking available for long-term anchoring in Glorietta Bay; all parking is

2    prohibited for a 2-4 hour period in the early mornings <u>except</u> for vehicles with boat trailers (Exhibit

3    "15"). This underscores that the intent of the Glorietta Bay recreational area is of a transient

4    nature. Boaters anchoring in Glorietta Bay for the 72 hour period are allowed to park their

5    vehicles with boat trailers.

6        It is clear from the evidence, and the lack of credible evidence presented by

7    GALLAGHER, that the A-9 Anchorage is a reasonable accommodation for those individuals that

8    because of a disability, cannot use the A-8 Anchorage.

9                                III.

10                    PROVIDING GALLAGHER WITH A FREE,
                   LONG-TERM ANCHORAGE IN GLORIETTA
11                  BAY MATERIALLY CONFLICTS WITH THE
                   DISTRICT'S MASTER PLAN AND WOULD
12                  FUNDAMENTALLY ALTER THE DISTRICT'S
                   SERVICE OF RECREATIONAL, SHORT-TERM
13                      BOATING IN GLORIETTA BAY

14        It is undisputed, as contained in the Offer, that the DISTRICT has an affirmative obligation

15    to afford a qualified individual with a disability the opportunity to participate in or benefit from the

16    aid, benefit, or service that is equal to that afforded others (28 CFR §35.130(b)(ii) ).

17        The service being offered by the DISTRICT is the use of a long-term, free anchorage in

18    San Diego Bay. Because of his disability, GALLAGHER could not use the A-8 Anchorage. As a

19    reasonable accommodation, the DISTRICT offered him free long-term anchorage at the A-9

20    Anchorage. Without ever trying to anchor there, GALLAGHER contends that it is not a

21    reasonable accommodation, and further that the only reasonable accommodation is Glorietta

22    Bay.

23        However, Title II of the ADA does not require a public entity to make an accommodation

24    which is unreasonable: "A public entity shall make reasonable modifications in policies, practices

25    or procedures when the modifications are necessary to avoid discrimination on the basis of

26    disability, unless the public entity can demonstrate that making the modification would

27    fundamentally alter the nature of the service, program, or activity" (28 CFR 35.130(b)(7).

28

-8-                    98-CV 0615 J(JAH)

1    The DISTRICT's Master Plan (Exhibit "16") is a document resulting from California state

2  enabling legislation, which provided for the creation of the DISTRICT. According to the Master

3  Plan, its purpose is to "provide the official planning policies, consistent with a general statewide

4  purpose, for the physical development of the tide and submerged lands conveyed and granted in

5  trust to the DISTRICT (Exhibit "16", p. 1).

6    The Master Plan contains specific provisions for small craft mooring and anchorage areas,

7  and describes each one. As a preface, it is noted: "[t]he use of bay water areas for residential

8  use, involving liveaboard vessels as a primary place of residence, is discouraged as a matter of

9  policy in accordance with state law" (emphasis added); (Exhibit "16", p. 44).

10  Further, the description of the Glorietta Bay Anchorage, also known as the A-5 Anchorage,

11  specifically states as follows: "[a]ll of the moorings in the anchorage are reserved for short-term

12  use by cruising vessels..[a]nchorage use is by permit of Harbor Police for a period of time up to

13  72 hours, within any seven-day period" (Exhibit "16", p. 45). Additionally, "the Plan proposes to

14  retain the low intensity use of the anchorage by reserving the anchorage for use by transient

15  cruising vessels and short durations of stay" (emphasis added); (Exhibit "16", p. 104).

16    The point is, NO ONE, disabled or not, is allowed to anchor in Glorietta Bay for longer than

17  72 hours. Obviously, GALLAGHER is welcome to anchor in Glorietta Bay within the parameters

18  of the Master Plan as often as feasible. However, determining that Glorietta Bay is a reasonable

19  accommodation for a free, long-term anchorage, undermines the objectives of the Master Plan

20  and would severely alter the nature of the service offered, which is as an anchorage for short-

21  term, visiting, and recreational use.

22    There is no dispute that the A-8 Anchorage is not as attractive an anchorage as Glorietta

23  Bay – that's why it, unlike Glorietta Bay, as well as La Playa Cove in Shelter Island, is free and

24  long-term. One could perhaps argue, (even though there is no accessible dinghy dock) that

25  Glorietta Bay is more attractive than the A-9 Anchorage – who would not want to be able to

26  anchor long-term, for free, in Coronado, right next to the Hotel Del Coronado, and the Silver

27  Strand? In order to determine what a REASONABLE accommodation is, the court must take into

28  consideration the fundamental purpose and nature of the services offered by each anchorage.

OPPOSITION TO MOTION TO ENFORCE JUDGMENT

1    The Master Plan makes it clear that all of the different anchorages serve different purposes to

2    accommodate lots of varied activities as well as lifestyles.  The nature and purpose of Glorietta

3    Bay is fundamentally different from that of the A-8 Anchorage; therefore, allowing GALLAGHER

4    to use Glorietta Bay, with a fundamentally different purpose and service than that of the A-8

5    Anchorage, would constitute a fundamental alteration of a DISTRICT service and as such would

6    not be a reasonable accommodation.

7                                    **CONCLUSION**

8         The evidence presented by the DISTRICT has proven that it did everything it agreed to in

9    the offer, thereby rendering plaintiff's motion to enforce the judgment moot.  There is also

10   overwhelming evidence that the A-9 Anchorage does constitute a reasonable accommodation for

11   use by GALLAGHER.  Finally, it is clear from the Master Plan, and the Glorietta Bay Anchorage

12   itself, that allowing GALLAGHER to anchor there free and long-term would fundamentally alter

13   the purpose and function of it.  Based upon the foregoing, defendant respectfully requests that

14   the motion to enforce the judgment be summarily denied.

15

16   Dated: 11/18/02                                Respectfully submitted,

17

18

19   By: _Ellen Faye Gross_____
          DAVID R. CHAPMAN
20        ELLEN FAYE GROSS
          Attorneys for Defendants
21        SAN DIEGO UNIFIED PORT DISTRICT

22

23

24

25

26

27

28

# PROOF OF SERVICE BY MAIL

I declare as follows:

I am over eighteen years of age and not a party to the within action; my business address is 550 West C Street, San Diego, California; I am employed in San Diego County, California.

On September 2, 2008, I served a copy of the within

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS; OBJECTION TO REQUEST FOR JUDICIAL NOTICE**

on the interested parties in the within action by placing a true copy thereof enclosed in a sealed envelope, with postage fully prepaid, in the United States Mail at San Diego, California, addressed as follows:

Steven Boehmer, Esq.                    Ellen Gross Miles
460 North Magnolia Avenue               3165 Pacific Highway
El Cajon, CA  92020                     San Diego, CA  92101
Attorney for City of Coronado           Attorney for Port District

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September 2, 2008, at San Diego, California.

_Michael Squell_